218 F.3d 1045 (9th Cir. 2000)
 ROBERT DEVEREAUX, Plaintiff-Appellant,
v.
ROBERTO RICARDO PEREZ, Defendant,
and
TIMOTHY DAVID ABBEY; LAURIE ALEXANDER; KATE CARROW; LINDA WOODS; EARL TILLY, in his official capacity as Public Safety Commissioner for the City of Wenatchee; CITY OF WENATCHEE, a municipal corporation; WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Defendants-Appellees.
 No. 97-35781
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted February 5, 1999--Seattle, Washington
Filed July 12, 2000
 
 1
 [Copyrighted Material Omitted]
 
 
 2
 Steven C. Lacy, Lacy & Kane, East Wenatchee, Washington, for the plaintiff-appellant.
 
 
 3
 Patrick McMahon, Carlson, Drewelow, McMahon & Kottkamp, Wenatchee, Washington, for defendant-appellee City of Wenatchee.
 
 
 4
 Jeff Freimund (briefed), Rene Tomisser (argued), Assistant Attorney General, Olympia, Washington, for defendantsappellees State of Washington, Department of Social and Health Services, Timothy David Abbey, Laurie Alexander, Kate Carrow and Linda Woods.
 
 
 5
 Appeal from the United States District Court for the Eastern District of Washington, Robert H. Whaley, District Judge, Presiding; D.C. No. CV-96-00115-RHW
 
 
 6
 Before: Pamela Ann Rymer and Andrew J. Kleinfeld, Circuit Judges, and Jeffrey T. Miller,[1] District Judge.
 
 
 7
 Opinion by Judge MILLER; Dissent by Judge KLEINFELD
 
 MILLER, District Judge:
 
 8
 In this case, Plaintiff Robert Devereaux ("Devereaux") appeals the district court's grant of summary judgment for defendants in a civil rights suit. Devereaux brought suit under 42 U.S.C. S 1983 claiming that his Fourteenth Amendment rights were violated by various governmental entities and employees during a child sexual molestation investigation. We affirm the district court's grant of summary judgment against all defendants.
 
 FACTS
 
 9
 The issue in this case is whether one of the victims of the Wenatchee, Washington "sex ring" prosecutions established a genuine issue of material fact entitling him to a jury trial against a defense of qualified immunity. Because this is an appeal from a summary judgment, we view the evidence in the light most favorable to Devereaux, the non-moving party.
 
 
 10
 From 1987 to 1990, Devereaux and his former wife were licensed foster parents caring for young girls. Following a 1990 divorce, Devereaux managed the foster home alone, and thereby encountered difficulties with several Department of Health and Human Services ("DSHS") and Child Protective Services ("CPS") employees, who "questioned the propriety of having a single man care for young girls without the presence of a female caretaker." Though lacking evidence, some DSHS employees suspected that Devereaux was sexually abusing the girls in his home. Other DSHS employees believed that Devereaux was being discriminated against because he was male.
 
 
 11
 In the spring of 1994, defendant Detective Robert Ricardo Perez ("Perez") of the Wenatchee Police Department attended a social function which was also attended by several DSHS employees.[2] At this function, Perez discussed the Devereaux foster home and, in admittedly bad humor, implied that Devereaux was probably abusing the foster girls. This lunch meeting was also attended by defendants Timothy David Abbey ("Abbey") and Laurie Alexander ("Alexander").
 
 
 12
 On August 1, 1994, one of Devereaux's foster children, "A.R.," was placed in juvenile detention because she was suspected of having tried to poison Devereaux and another foster girl.[3] When interviewed by officer Addock, A.R. admitted to poisoning Devereaux because Devereaux would not permit her to see her boyfriend, with whom she was having sex. On August 3, 1994, Perez interviewed A.R.. Perez did not seek information about the poisoning but, rather, about whether A.R. had ever been sexually abused by Devereaux. Upon questioning, A.R. at first denied that Devereaux had ever sexually abused her. However, she later recanted and stated that Devereaux had raped her and other foster children.
 
 
 13
 The next day, on August 4, 1994, A.R. was interviewed by another DSHS employee, Paul Glassen. A. R. informed Glassen that Perez had advised her that another foster girl reported that Devereaux was having sex with yet another foster girl and that he was touching girls under their clothes in bed. A.R. also stated that Perez had pressured her into setting up Devereaux and that Perez made her say a "whole bunch of lies." Glassen immediately relayed this information to his supervisor, Katie Hershey. The next day, on August 5, 1994, Glassen was arrested for witness tampering because of his interview with A.R. and was later placed on administrative leave.
 
 
 14
 At least one other interview with A.R. is pertinent to Devereaux's claims. On March 3, 1995, A.R. was again interviewed by Perez. Also present were two CPS caseworkers: defendant Katie Carrow ("Carrow") and Vicki Bergstrom. A.R. stated that Perez "make[s] all the children lie" and that she was not raped by Devereaux. During the interview Perez informed A.R. that if her earlier testimony was a lie then he would send a report to the prosecutor for consideration of filing charges for false reporting. Following this threat of potential prosecution, A.R. stated that her earlier statements had been a lie.
 
 
 15
 Meanwhile, after the August 3rd interview of A.R., Perez went to the Devereaux home and took Devereaux to the police station. Perez then interviewed Devereaux. Devereaux denied that he had sexually abused any of his foster children. He mentioned, however, that A.R. had touched his penis while he was awake, but that he had made her stop. He also "described approximately fifteen instances in which A.R. had`flashed' him, instances when he awoke to find her in his bed, and an instance where she had run out of the shower naked and jumped on his lap. He described other sexual conduct by A.R., such as `humping' him, but said that he could not prevent these things from happening."
 
 
 16
 While Perez was interviewing Devereaux, defendant Linda Wood ("Wood") arrived at the police station with "A.S.," another of Devereaux's foster children. Perez met briefly with A.S., who denied that there was any sexual abuse in the Devereaux home. Perez then returned to continue his interview with Devereaux and informed him that he did not believe Devereaux was innocent. In exasperation, Devereaux told Perez that he had sexual intercourse with A.R. two or three times.
 
 
 17
 When asked to describe these incidents, Devereaux replied that he couldn't because he was making them up. Perez subsequently placed Devereaux under arrest on one count of rape of a child in the third degree based on Devereaux's contact with A.R.
 
 
 18
 After Devereaux was sent to jail to be booked, Perez interviewed two other of Devereaux's foster children,"A.K." and "T.H." Both A.K. and T.H. stated that Devereaux never molested them. A. K. also stated that she frequently observed Devereaux spend several hours in A.R.'s room at night with the door closed and that she had seen Devereaux masturbate on two occasions. T.H. reported that Devereaux would tickle her and run his fingers up her thigh until she told him to stop.
 
 
 19
 Later that day, Perez interviewed A.S. a second time in the presence of defendant Wood. The interview commenced at 5:00 p.m. and A.S. repeatedly denied ever having been sexually abused by Devereaux. During the interrogation, Wood admonished A.S. to tell the truth. Finally, after 6 hours of interrogation, at 11:00 p.m., A.S. finally stated that she had been sexually abused by Devereaux. Later, A. S. stated that she made this accusation only because she was "sick and tired" of being interrogated. Thereafter, Perez rearrested Devereaux and charged him for the rape and molestation of A.S.[4] At the request of the city police, Wood, along with other DSHS employees, assisted in finding alternative placement for some of Devereaux's foster children.
 
 
 20
 At an August 4, 1994, probable cause hearing, a state superior court judge entered an order finding probable cause for Devereaux's arrest on the charges of child rape and molestation. The probable cause order prohibited Devereaux from having any contact with his foster children or any minor females. Devereaux was then released on an appearance bond.
 
 
 21
 On August 10, Sergeant Pippin and CPS caseworker Carrow interviewed "D.E.," another foster child in the Devereaux home since 1993. D.E. denied having been abused by Devereaux and denied seeing any sexual abuse. Pippin did not prepare a written report of this interview but told Perez about its contents.[5] After D.E. was removed from Devereaux's home, she was placed in Perez's home as a foster child. While D.E. was living at Perez's home, approximately seven months later she changed her story.
 
 
 22
 On March 14, 1995, D.E. was again interviewed by Perez, Carrow, and Alexander. In contradiction to her earlier statements, she described participating in group sex orgies at over twenty different locations commencing when she was two years old. These orgies took place at summer camp, local residences, and at a local church. She implicated her grandparents, aunts and uncles, siblings, neighbors, members of the clergy, parents, CPS caseworkers, Salvation Army employees, cab drivers and other children as participants in the sex orgies. According to D.E., almost every night of the week Devereaux and numerous other adults would each sexually abuse approximately 15 children. D. E. would eventually identify over 58 adults and children who would participate in these orgies. Based upon this interview with D.E., Devereaux was charged with additional counts of child molestation.[6]
 
 
 23
 On March 23, 1995, Perez and Alexander interviewed "C.M.," another foster child, who indicated that she and other children had been sexually abused by Devereaux and others and that her mother had been aware of the abuse. On March 25, 1995, Perez interviewed C.M.'s mother, Linda Miller ("Miller"), who confessed to abusing C.M. and several other children. She named Devereaux, one of the social workers, the minister of her church and many other individuals as participants in the group sex orgies. She stated that these orgies occurred at many different homes in the community, even at a local church. Perez arrested Miller, charging her with multiple counts of rape of a child in the first degree.[7]
 
 
 24
 Following Miller's arrest, Perez and Alexander met with C.M., and Alexander informed C.M. of her mother's confession, though later neither Perez nor Alexander notified the county prosecutor that C.M. had been told about her mother's confession. C.M. was later examined by a medical doctor who concluded that C.M. was not sexually active because her hymen was still intact. On May 16, 1995, Perez, Alexander, and the county deputy prosecutor conducted a further interview with C.M. in which she again implicated Devereaux and also alleged that her mother was directly involved in the abuse.
 
 
 25
 Thereafter, C.M.'s sister, "A.M.," another foster child, was interviewed by Perez and Alexander, who informed her that her mother had made a confession. Devereaux asserts that this was an attempt to induce A.M. to make false allegations against him. Though neither the interview nor the techniques employed therein were ever directly communicated to Devereaux, his counsel learned about them through discovery in the criminal case.
 
 
 26
 Other children told CPS caseworkers and Perez that the sex charges were false. At some time prior to September 1995, C.S., another foster child who lived in the Devereaux home during 1992 and 1993, was interviewed by Carrow and Pippin. She stated that she had never witnessed sexual abuse in Devereaux's home. She also stated that she was home every night by dinner time and would have seen the group orgies had they occurred.[8]
 
 
 27
 Based upon the alleged child sexual abuse, 43 adults were ultimately charged with over 29,000 counts of sexual molestation. An amended information was filed on May 11, 1995, which charged Devereaux with five counts of rape of a child in the first degree (involving A.S., D.E., and A.M.), two counts of child molestation in the first degree (involving A.M. and C.M.), two counts of child molestation in the second degree (involving A.S.), and one count of tampering with a witness. After being investigated, with charges pending for over a year, all charges were eventually dropped as part of a plea bargain where, in exchange for a dismissal of all the felony charges pending against him, Devereaux pled guilty to one count of rendering criminal assistance and one count of fourth degree assault for having spanked D.E.. Viewing the evidence in the best light, the district court concluded that the charges were dropped for lack of evidence. At sentencing, the state court prohibited Devereaux from having contact with certain children, from being a foster parent for two years, and from being employed in a field that caters to or has regular contact with minor children.
 
 
 28
 Thereafter, Devereaux filed a 42 U.S.C. S 1983 suit against Perez; Abbey; Alexander; Carrow; Wood; DSHS; the City of Wenatchee; Kenneth Badgley, in his official capacity as police chief for the Wenatchee Police Department; and Early Tilly, Wenatchee Public Safety Commissioner. Plaintiff claimed that defendants manipulated and coerced the children to give false evidence against him and withheld andignored exculpatory evidence. In a series of three orders, the district court granted summary judgment for all defendants and then declined to exercise supplemental jurisdiction over the state law claims and dismissed the state claims without prejudice. Devereaux filed a timely appeal only as to the dismissal of the S 1983 claim.
 
 
 29
 While this appeal was pending, Devereaux's appeal was dismissed with prejudice as to Perez and Kenneth Badgley pursuant to a settlement agreement. Devereaux does not challenge the dismissal of the claims against the State of Washington, DSHS, Earl Tilly in his capacity as Commissioner for the City of Wenatchee, and the City of Wenatchee.[9] Accordingly, the appeal remains pending as to the following defendants: Abbey, Alexander, Carrow, and Wood (collectively "Individual Defendants").
 
 ANALYSIS
 Standard of Review
 
 30
 A district court's decision that an asserted federal right was "clearly established" such that qualified immunity in a 42 U.S.C. S 1983 action attached at a particular point in time is a question of law to be reviewed de novo on appeal. See Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994); Thompson v. Mahre, 110 F.3d 716, 721 (9th Cir.), cert. denied, 522 U.S. 967, 118 S. Ct. 414, 139 L.Ed.2d 317 (1997). A district court's decision to grant summary judgment is also reviewed de novo. See Crow Tribe of Indians v. Racicot, 87 F.3d 1039, 1043 (9th Cir. 1996). This court must assume the relevant facts in the light most favorable to the plaintiff, and then determine whether the defendants are nonetheless entitled to qualified immunity as a matter of law. See Moran v. Washington, 147 F.3d 839, 844 (9th Cir. 1998).
 
 
 31
 The plaintiff bears the burden of demonstrating that the underlying right was clearly established at the time of the alleged misconduct. See Romero v. Kitsap County , 931 F.2d 624, 627 (9th Cir. 1991). If the plaintiff meets this burden then the officials must prove that "their conduct was reasonable under the applicable standards even though it might have violated the plaintiff's constitutional rights." Benigni v. City of Hemet, 879 F.2d 473, 480 (9th Cir. 1988).
 
 The S 1983 Claim[10]
 
 32
 Individuals may maintain a civil rights action when the government deprives them of any rights, privileges, or immunities guaranteed by both the United States Constitution and federal laws. See 42 U.S.C. S 1983. This statute is designed to protect individuals from an abuse of state power by providing a cause of action against state and local officials who, acting within the scope of their duties, have deprived an individual of a cognizable federal right. See Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).
 
 
 33
 Years ago, the Supreme Court enunciated the principle that the threshold inquiry in a S 1983 analysis is whether the S 1983 claimant has identified a right cognizable under the statute. See id, 443 U.S. at 140, 99 S.Ct. at 2692 (The first inquiry in any S 1983 suit is "to isolate the precise constitutional violation with which [the defendant] is charged."); see also Allen v. City of Portland, 73 F.3d 232, 235 (9th Cir. 1995). Once a cognizable right is identified, the court "proceed[s] to determinewhether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999)).
 
 
 34
 "This order of procedure is designed to `spare a defendant not only of unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.' Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."
 
 
 35
 Id; see also Baker, 443 U.S. at 140, 99 S.Ct. at 2692. This analytical approach makes legal and common sense because if, at the threshold, a S 1983 claimant has not identified a right cognizable under the statute, the analysis should go no further. In this appeal we address the question of whether qualified immunity bars S 1983 liability on the part of the Individual Defendants as the district court so ruled based upon the issue presented below. The analysis of whether qualified immunity protects the Individual Defendants from S 1983 liability in this case is similar to the traditional threshold question of whether a right cognizable underS 1983 has been identified by Devereaux.
 
 
 36
 The purpose of the defense of qualified immunity is to protect public officials "from undue interference with their duties and from potentially disabling threats of liability. " Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). This defense recognizes that the interests of both the public official and society are best served by shielding officials from liability in order to permit the officials to carry out discretionary functions without fear of harassing litigation, "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will `dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.' " Harlow, 457 U.S. at 814, 102 S.Ct. at 2736 (citations omitted); see also Davis v. Scherer , 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (Qualified immunity plays a critical role in striking the "balance . . . between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties.").
 
 
 37
 The rule of qualified immunity" `provides ample support to all but the plainly incompetent or those who knowingly violate the law.' " Burns v. Reed , 500 U.S. 478, 494-95, 111 S.Ct. 1934, 1944, 114 L.Ed.2d 547 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). "Therefore, regardless of whether a constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not `clearly established' or the officer could have reasonably believed that his particular conduct was lawful." Romero, 931 F.2d at 627. Furthermore, "[t]he entitlement is an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). To determine whether a right is clearly established, the court evaluates the specific contours of the constitutional right, not at the general but at the more specific level:
 
 
 38
 "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).
 
 
 39
 Devereaux contends that the Individual Defendants violated his Fourteenth Amendment right to due process by intentionally employing improper interview techniques to child witnesses which resulted in an innocent person being falsely accused of child sexual abuse. According to Devereaux, this right was violated when "defendants coerced or threatened child witnesses, secreted alleged victims from those who would question the credibility of their accounts, and influenced alleged child victims in order to fabricate evidence." Devereaux cites no legal authorities holding that a foster parent has a Fourteenth Amendment right to have a child sexual molestation case investigated in any particular manner. However, he contends that pre-existing case law establishing such a constitutional right is not a prerequisite because the Individual Defendants conduct was so patently violative of his constitutional rights that reasonable officials would have known that their conduct was unconstitutional. See Mendoza v. Block, 27 F.3d 1357, 1361-62 (9th Cir. 1994). In Mendoza, we observed that while closely analogous prior case law involving an identical fact context is not required for qualified immunity to be withheld, the unlawfulness of the action in question must be apparent in light of some pre-existing law. See id. Thus, the Mendoza court found that a case establishing that the excessive use of force by police officers during an arrest violated clearly established Fourth Amendment principles could be applied to the issue of whether the excessive use of a police dog in arresting a suspect was an excessive use of force. See id. at 1362.
 
 
 40
 While Devereaux attempts to mold his legal theory as a Fourteenth Amendment violation, we conclude that Devereaux has failed to satisfy the threshold requirement of a S 1983 claim, that is, the identification of a cognizable right. The Fourteenth Amendment does not protect against all deprivations of liberty, "only against deprivations of liberty accomplished `without due process of law.' " Baker, 443 U.S. at 145, 99 S.Ct. at 2695. Here, Devereaux fails to raise a genuine issue of material fact or law regarding the interview techniques employed by the Individual Defendants. Devereaux simply contends that had the Individual Defendants implemented different interview techniques he would not have been charged at all.
 
 
 41
 After reviewing relevant case law, we conclude that there is no constitutional due process right to have child witnesses, in a child sexual abuse investigation, interviewed in a particular manner or pursuant to a certain protocol. Devereaux has failed to show that the state defendants violated a constitutional right that is sufficiently particularized so that a reasonable official would understand that any due process right was violated. In Meyers v. Morris, 810 F.2d 1437 (8th Cir.), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987), abrogated on other grounds, Burns, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547, the Eighth Circuit rejected the notion that improper interviewing of child witnesses in a sexual abuse investigation may give rise to a due process violation under the Fourteenth Amendment.
 
 
 42
 "While the record contains examples of investigative mistakes and flawed interrogation, particularly from the standpoint of successful prosecution of those implicated by children who have experienced extensive questioning, an imperfect investigation without more does not deprive the investigators of qualified immunity. Immunity is forfeited for the questioning function upon at least a preliminary showing that the interrogation so exceeded clearly established legal norms for this function that reasonable persons in the detectives' position would have known their conduct was illegal . . .
 
 
 43
 We conclude that the interviewing conduct occurred in a grey area of investigative procedure as to which there were, and probably still are, less thanclearly established legal norms. The grey area referred to involves the extent to which juvenile suspected sexual abuse victims may reasonably be questioned, particularly if they initially deny abuse, and the extent to which leading questions, confrontation with reports by others and photographs of suspects may be used . . .
 
 
 44
 We do not consider the standards for the interrogation of juvenile witnesses and victims, particularly in the area of sexual abuse, so clearly established in 1984 that on the basis of hindsight the deputies should now be forced to defend their questioning techniques in these damage suits."
 
 
 45
 Id. at 1460-61; see also Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993) ("The right to family integrity clearly does not include a constitutional right to be free from child abuse investigations."); Doe v. State of Louisiana , 2 F.3d 1412, 1417-18 (5th Cir. 1993), (child protective services employee and her supervisor who allegedly manipulated children to give false evidence, coerced witnesses, made false representations, and ignored exculpatory evidence did not violate the constitutional right of family integrity), cert. denied , 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); Frazier v. Bailey, 957 F.2d 920, 931 (1st Cir. 1992) (noting that "the dimensions of [the] right [to family integrity ] have yet to be clearly established" and applying qualified immunity to suit in which social worker allegedly interfered with family integrity by ignoring exculpatory evidence and causing children to falsely accuse their father of child abuse); Stem v. Ahearn, 908 F.2d 1 (5th Cir. 1990), (a grossly negligent investigation by child protective services employees wherein the investigators failed to interview the suspect and disregarded clear medical evidence that the child was not molested does not violate any clearly established right), cert. denied, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991).
 
 
 46
 There can be no question that an investigation of suspected or reported child sexual molestation may be extremely difficult. Inherent in any child sexual abuse investigation lurks the task of law enforcement and child welfare personnel to navigate through a cauldron of intense emotions, hidden motives, devastating accusations and counter-accusations, and conflicting and recanted statements. To repose in such officials the heavy burden of fairly and effectively investigating such cases at the risk of incurring personal damage liability under S 1983 should the manner of the investigation not conform to an abstract constitutional standard will undoubtedly have a chilling effect on those charged with investigating and detecting child sexual abuse.
 
 
 47
 Applying the foregoing principles to Devereaux's claim, and viewing the evidence in the light most favorable to him, we hold that Devereaux's S 1983 claim is not viable. In this case, Devereaux's claimed legal right to have a child sex abuse investigation conducted in such a manner to avoid leading questions, influencing or manipulating the child witnesses, or eliciting inconsistent statements is such a generalized legal right as to "convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging [a] violation of extremely abstract rights." Anderson, 483 U.S. at 639, 107 S.Ct. at 3039.
 
 
 48
 The evidence relied upon by Devereaux is so general and unavailing that it would create a nebulous, unconstrained abstract constitutional right. The undisputed evidence reveals that defendant Carrow accompanied Perez on approximately fifty interviews. Sometimes Carrow asked questions and other times she took notes while Perez questioned the interviewee. Carrow was present during the March 3, 1995 second interview of A.R. where Perez told the child that if she changed her story then he would send a report to the prosecutor for possible prosecution. Carrow also testified that she saw nothing wrong with using this technique on suspected child sexual abuse victims. Another specific instance of Carrow's allegedly impropertechnique occurred during the interview of C. S., a former foster child at the Devereaux home. Carrow did not believe C. S. when she provided exculpatory and truthful evidence that Devereaux could not have sexually abused the children.
 
 
 49
 Devereaux cites even less evidence against the remaining Individual Defendants. On August 3, 1994 defendant Wood brought A.S. to the police station and was present during the interview. She even asked questions and told A.S. to "tell the truth." The gravamen of the claims against defendants Abbey and Alexander is that they were present and frequently participated in the interviewing of child witnesses. Defendant Abbey did not participate in any pre-arrest investigations of child abuse and his only role in the investigation was to participate in one or more interviews conducted by the local police wherein unidentified children stated that they had been sexually abused by Plaintiff. Such general evidentiary matters are insufficient to support a claim that Devereaux was deprived of any particularized due process right. See Todd v. United States, 849 F.2d 365, 370 (9th Cir. 1989) ("[T]he right referenced by the Harlow test is not a general constitutional guarantee . . . but its application in a particular context.").[11]
 
 
 50
 The present action, like Baker v. Racansky, 887 F.2d 183 (9th Cir. 1989), "involves the difficult balancing of a family's right to autonomy against the state's interest in protecting minor children from abuse." Id. at 187.
 
 
 51
 If law enforcement personnel who have at least arguable probable cause to believe that adults have been molesting children are not entitled to reasonable belief that the adults may pose a danger to their own children, then the law was (and is) not clearly established. There is certainly no available legal precedent to this effect.
 
 
 52
 Id. (quoting Myers, 810 F.2d at 1463). As noted in Baker, "if the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered `clearly established' at least in the absence of closely corresponding factual and legal precedent." Id. at 187 (quoting Meyers, 810 F.2d at 1462). Here, the underlying substantive constitutional right -whatever that might be -must in some way balance the rights and interests of the legal guardians (whether parents or foster parents), the child, and the public. The need to subject this abstract substantive constitutional right to a balancing test which weighs the interest of a parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome, especially in light of the requirement that the substantive constitutional right be "clearly established" at the time of the alleged violation.
 
 
 53
 This does not mean that a state actor investigating suspected or reported child sexual abuse may never be held accountable for violation of cognizable constitutional rights. For example, the constitutional right to be free from the knowing presentation of false or perjured evidence in a criminal prosecution is clearly established. See Pyle v. Kansas, 317 U.S. 213, 215, 63 S.Ct. 177, 87 L.Ed. 214 (1942); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). In both Pyle and Money, a state prisoner filed a habeas petition alleging that his due process rights were violated by the prosecution's knowing use of perjured testimony to convict him and by the prosecution's deliberate suppression of evidence that would have impeached and refuted the testimony given against him. See Pyle, 317 U.S. at 216, 635 S.Ct. at 178; Mooney, 294 U.S. at 110, 55 S.Ct. at 341. In each case, the Supreme Court held that such a due process right exists. See Pyle,317 U.S. at 216, 635 S.Ct. at 178; Mooney, 294 U.S. at 112, 55 S.Ct. 342. In Hysler v. Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed 932 (1942), the Supreme Court observed that if "responsible officials knowingly use false testimony which was extorted from a witness `by violence and torture,' one convicted may claim the protection of the Due Process Clause against a conviction based upon such testimony." Id, 315 U.S. at 413, 62 S.Ct. 690. Unlike the plaintiffs in those cases, however, Devereaux is not claiming a due process violation as a result of an improper conviction premised upon the deliberate use of perjured testimony.
 
 
 54
 The record before the court does not reveal any evidence giving rise to an inference that the Individual Defendants knowingly presented false evidence to be used in Devereaux's sexual abuse prosecution. In the absence of evidence tending to show that the Individual Defendants deliberately fabricated evidence of child sexual abuse in order to cause Devereaux cognizable harm, Devereaux's claim must fail. See Snell v. Tunnel, 920 F.2d 673 (10th Cir.), cert. denied, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1990) (child care workers that deliberately fabricated allegations of child prostitution and pornography in order to have the children removed from foster care pursuant to a court order are not entitled to qualified immunity).
 
 
 55
 The record reveals an investigation which was far from textbook perfect but not so outrageous that it offends traditional notions of due process or any clearly established constitutional right of due process. The constitutional dimensions of investigatory techniques employed to discover child sexual abuse are simply not clearly established. Upon review of the summary judgment for the Individual Defendants, the evidence supports only one finding: the interview techniques used by the Individual Defendants were not so "patently violative of [a] constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional." Mendoza, 27 F.3d at 1361 (quoting Casteel v. Pieschek, 3 F.3d 1050, 1053 (7th Cir. 1993)).
 
 
 56
 Devereaux also contends that DSHS policy manuals and Revised Code of Washington S 26.44.030(10) have established sufficiently clear standards such that CSP caseworkers who fail to follow the dictates of the manual and S 26.44.030(10) are subject to S 1983 liability. In particular, Devereaux argues that the Individual Defendants failed to interview the child witnesses in a timely fashion as required by the internal policy manuals and to comply with Revised Code of Washington S 26.44.030(10) which provides for the presence of a third party during the questioning of a child if "the child wishes a third party to be present for the interview and, if so, shall make reasonable efforts to accommodate the child's wishes." Wash. Rev. Code Ann. S 26.44.010(10) (1998). With respect to the internal policy manual's interviewing techniques, such manuals do not constitute decisional law giving rise to a constitutional duty under S 1983. Even where the interview techniques were not followed, state law may serve as a basis for S 1983 liability only where such violation is cognizable under federal law. See 42 U.S.C. S 1983. Moreover, the guidelines cannot be used to controvert precedent in other circuits that the improper interviewing of a child witness during the course of a sexual abuse investigation does not give rise to a constitutionally protected due process right. See James v. United States Parole Comm'n, 159 F.3d 1200, 1205 (9th Cir. 1998), (it is well-settled that internal policy manuals do not generally create due process rights in others), cert. denied, 525 U.S. 1186, 119 S.Ct. 1131, 143 L.Ed.2d 124 (1999)[12].
 
 
 57
 For the foregoing reasons, summary judgment for the Individual Defendants is
 
 
 58
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Jeffrey T. Miller, United States District Judge for the Southern District of California, sitting by designation.
 
 
 [2]
 Pursuant to a settlement agreement, Devereaux's appeal was dismissed with prejudice as to defendants Perez and Kenneth Badgley, Chief of Police for the City of Wenatchee.
 
 
 [3]
 A.R. suffered from fetal alcohol syndrome, a fact known by Perez.
 
 
 [4]
 According to the mental health counselor of A.S., she had falsely accused the counselor of sexually abusing her numerous times when she did not get her way. A.S. also had a propensity to act out sexually, having been the subject of pleas by Devereaux to CPS caseworkers for help in dealing with her behavior.
 
 
 [5]
 The district court, taking the facts in the light most favorable to Devereaux, assumed that neither Pippin nor Perez relayed this information to the prosecutor.
 
 
 [6]
 Viewing the evidence in the light most favorable to Devereaux, during the prosecution of Devereaux, he and his lawyer were never told about D.E.'s exculpatory statements of August 10, 1994 wherein she stated that she never witnessed any sexual abuse at the Devereaux home.
 
 
 [7]
 Linda Miller was the only witness who never recanted her story that Devereaux molested children.
 
 
 [8]
 Apparently, this exculpatory evidence was never disclosed to Devereaux or his counsel during the criminal proceeding.
 
 
 [9]
 The court does not reach the claims asserted against these defendants because "[i]ssues not `specifically and distinctly raised' in the opening brief need not be considered by the court." United States v. Montoya, 45 F.3d 1286, 1300 (9th Cir. 1995) (quoting Officers for Justice v. Civil Serv. Comm'n, 979 F.2d 721, 726 (9th Cir. 1992)).
 
 
 [10]
 Devereaux argued below, and his brief mentions, that his constitutional rights were violated by the suppression of exculpatory evidence, but he does not raise suppression of exculpatory evidence as an issue on appeal, so we do not consider it.
 
 
 [11]
 The dissent argues that the Individual Defendants' conduct was so blatant as to be per se violative of the Fourteenth Amendment. See Mendoza, 27 F.3d at 1361-62; United States v. Lanier, 520 U.S. 259, 271 (1997). In this case, however, the complained of conduct cannot be equated to the egregious circumstances in those cases.
 
 
 [12]
 Similarly, Devereaux cannot prevail on his theory that a violation of RCW S 26.44.030(10) may give rise to a S 1983 claim. Even if applicable, the court does not reach the issue because there is no evidence in the record even suggesting that any child witness satisfies the threshold requirement of requesting the presence of a third party.
 
 
 KLEINFELD, Circuit Judge dissenting:
 
 59
 I respectfully dissent.
 
 
 60
 Devereaux presented solid evidence that the defendants actively coerced witnesses to tell lies that would subject him to punishment for crimes he did not commit. For that wrong, there can be no immunity. Any government official should know that a person has a constitutional right not to be "framed."
 
 
 61
 There was only one witness, Linda Miller, who said from the beginning and stuck to her story that Devereaux sexually abused children. Any reasonable person in the investigators' position would have known better than to believe her.[1] She described frequent sex orgies lasting most of the night involving Devereaux, a man in his late 50's, and many other adults with many children, involving so many dozens of acts of sexual intercourse by these people that in all likelihood staying awake so long and performing the acts would be physically impossible. The defendants had to know to a certainty that Miller's story was false after they obtained a medical examination of Miller's daughter. Miller had said that in the orgies, dozens of adult men engaged in sexual intercourse with her daughter. Yet her daughter turned out to have an intact hymen, so her mother's story was physically impossible. Miller's story was implausible even before the medical examination. Once it was known to a medical certainty that the girl, whom Linda Miller said had had sexual intercourse with many men, was in fact a virgin, the defendants lost any excuse for coercing girls who exonerated Devereaux into changing their stories and accusing him. Devereaux's evidence establishes that despite her intact hymen, which proved the falsity of the claim that numerous adult men had engaged in sexual intercourse with her, the daughter said defendant Alexander compelled her to "be part of the lie " against Devereaux.
 
 
 62
 According to Devereaux's evidence, much of which is uncontradicted, when defendants interviewed the children he cared for, they coerced the children to lie. Many of the children's statements say so. The children's denials that Devereaux had acted inappropriately were rejected, and the children were held alone in custody, harangued, and threatened, until they broke down and said Devereaux had sexually molested them, which accusations were recanted when the children were freed from custody.
 
 
 63
 For example, A.R., the first of the children interviewed, initially told the investigators that Devereaux had not sexually abused her. The interview came about because she had tried to poison Devereaux and another girl in the foster home. Defendants knew that she was a victim of fetal alcohol syndrome, a brain disorder of children impaired in utero by maternal alcohol consumption, some characteristics of which are "inappropriate social behavior, memory deficits . . . lack of judgment, lack of remorse for misbehavior, lying,. . . unusual aggressiveness, and wide variations in learning abilities at different times."[2] The police report about the interview says that A.R. "suffers from fetal alcohol syndrome and has difficulty in remembering some events." Despite A.R.'s vulnerability because of her fetal alcohol syndrome, she was repeatedly questioned until she changed her story and said that Devereaux had raped her. Then when she reverted to her original story, that Devereaux did not rape her and that Detective Perez "make[s] all the children lie, " shewas threatened, in an interrogation in which one of the defendants participated, with criminal prosecution. Strikingly, so far as the record shows, she was not threatened with prosecution as a result of trying to poison two people, which she admitted, but only for changing her story about whether he had sexual contact with her. The threat, especially combined with her known brain defect, and the evidence known to her interrogators that Devereaux did not sexually abuse the children as alleged, supports the inference that she was being coerced to lie in order to take away Devereaux's liberty.
 
 
 64
 Likewise A.S., another of the girls Devereaux had cared for, initially said Devereaux had not sexually abused her or anyone else in the home that she knew of. The social workers' file on her reflected a history of making false accusations that males had sexually abused her. She was the other victim of A.R.'s poisoning attempt, so they knew that she was unlikely to be coordinating her story with A.R., and they knew that if she accused someone of sexual abuse, skepticism was appropriate. Yet even from her, exoneration of Devereaux was not accepted. Defendant Wood took her to the police station. She was interrogated by Detective Perez and defendant Wood in the police station for six hours, from 5:00 P.M. to 11:00 P.M. Wood kept telling her to "tell the truth" as she repeatedly said that Devereaux had not sexually abused her, until at 11 at night, "sick and tired of sitting there" as A.S. later said, she told Wood and Perez what they insisted on hearing, that Devereaux had sexually molested her, whereupon they let her go and Perez went to Devereaux's house and arrested him for a second time. Holding this child in custody in the police station, and drenching her with sex talk for six hours until late at night when she yielded to this pressure to accuse Devereaux, likewise supports the inference that defendant Wood together with Detective Perez was knowingly coercing her to make a false accusation against Devereaux.
 
 
 65
 Likewise D.E. initially stated Devereaux had not sexually abused her or anyone else. But she changed her story after Detective Perez made her live with him in his house. Defendants Alexander and Carrow together with Perez interrogated her again, and this time she described huge sex orgies every night of the week where numerous adults including Devereaux forced numerous children to have sexual intercourse. The change in her story after living with Perez, the detective who wanted the new story, together with the likely physical impossibility of her allegations, supports the inference that the defendants and Perez coerced her, by having her live under Perez's control in his house, to make what they knew were false statements. Further evidence of guilty knowledge is that her earlier statement, that Devereaux did not sexually abuse her and that she did not see him sexually abuse anyone else, was kept out of the social workers' file. When defendant Carrow was asked why the exonerating statement was not disclosed (it was kept secret from defense counsel), she said that she thought D.E. meant that Perez had not abused her. Yet, the entire interview in which D.E. made her exonerating statement concerned Devereaux, not Perez. This response by defendant Carrow supports an inference that Carrow intentionally testified falsely that D.E. was exonerating Perez against whom no accusation was made, because she was conscious of her own wrongdoing regarding D.E.'s exonerating statement being kept out of the file and out of defense counsel's hands.
 
 
 66
 These are but a few of many similar courses of conduct with many child witnesses. The repeated pattern is that the child says Devereaux did not sexually abuse her or anyone else, and then one or more of the defendants and Perez take the child into custody and subject her to extensive interrogation, calling her a liar when she sticks to her exonerating story, and letting her go only when she changes her story to accuse Devereaux. Sometimes the coercion is a threat of prosecution.Sometimes it is long isolation and interrogation late at night. For all the children, subjecting them to the psychological discomfort of hours of sex talk itself could be taken to be coercion, where there was little apparent factual basis for it, much as forcing young girls to watch pornographic movies until they said what interrogators wanted from them could be taken as coercive.
 
 
 67
 Thus Devereaux presented evidence in opposition to summary judgment that defendants, knowing that he most probably did not sexually abuse the children he cared for, nevertheless coerced the children to accuse him falsely. Defendants' successful argument in the appeal before us is not that his evidence fails to support this proposition. Their argument is that even if it does, they are entitled to qualified immunity, because there was no well established principle of constitutional law establishing any right that this conduct violated.
 
 
 68
 The question, in a qualified immunity legal analysis, boils down to "Should they have known better?" That is, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates [a constitutional] right."[3] A government official cannot act with qualified immunity just because "the very act in question" has not been held unlawful; the unlawfulness need only be "apparent" "in light of preexisting law."[4] The point of qualified immunity doctrine is to allow government officials to perform their duties without disabling threats of liability or even suit, but only so long as they do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."[5] The immunity is qualified rather than absolute, and officials should be "made to hesitate" by exposure to liability where they "could be expected to know that certain conduct would violate statutory or constitutional rights."[6]
 
 
 69
 This doctrine does not grant government officials immunity if they engage in action that a sensible person would realize was unconstitutional, even though there is no case on all fours that holds the conduct to be unconstitutional. The social workers argue, and the majority appears to accept their argument, that until a judicial decision tells social workers how to conduct interrogation of a child in a sex abuse case, virtually any sort of interrogation is permissible. The Supreme Court has expressly disabused us of the notion that officials cannot lose their qualified immunity until a judicial decision has announced a rule applicable to their conduct. In United States v. Lanier[7] a judge had sexually assaulted several women in chambers, including one where submission to the assaults was related to disposition of her case. The Sixth Circuit, construing the criminal analog to section 1983, held that because no constitutional right had been identified by the Supreme Court in a case with similar facts, the judge had insufficient notice that his conduct was unconstitutional.[8] The Supreme Court reversed, holding that the Sixth Circuit test was incorrect. The proper test was whether there was "fair warning, " that is, whether the unlawfulness under the Constitution was "apparent."[9] The level of specificity with which the relevant constitutional right was identified in prior case law necessarily would vary with the circumstances. Thus despite the absence of any case law governing judges' assaultive sexual conduct with litigants, the judge in Lanier was held to have violated a clearly established constitutional right, because requiring caselaw on judges' sexual assault of litigants would be an excessive demand for specificity.
 
 
 70
 The basis for the majority decision, a requirement of case law telling social workers how to interview children in a sex abuse case, is likewise an excessive demand for specificity. Sometimes officials lack qualified immunity despite the absence of a case in point, as in Lanier, and sometimes they enjoy qualified immunity despite the presence of a case in point, where the law is undeveloped or conflicting.[10] The test is not whether there is case law, but whether the conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[11] The presence or absence of case law bears on whether the right is clearly established, but is not necessarily determinative either way.
 
 
 71
 The Supreme Court in Lanier quoted with approval a hypothetical case a dissenting judge had articulated in the Sixth Circuit decision. The hypothetical case specifically refutes the notion that social workers enjoy qualified immunity so long as there is no case on all fours telling them that social workers' conduct in similar circumstances is unconstitutional. "The easiest cases don't even arise. There has never been. . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages."[12] Thus it is clearly established that absence of a case in point does not necessarily entitle social workers to qualified immunity.
 
 
 72
 Today's majority decision is based on the proposition variously articulated as the absence of cases "holding that a foster parent has a Fourteenth Amendment right to have a child sexual molestation case investigated in any particular manner,"[13] no such clearly defined standards for the interrogation of child sexual abuse victims,[14] and no established constitutional norm for interviewing child witnesses.[15] This phrasing begs the question of whether a constitutional right has been clearly established by the case law, and phrases the test in positive terms that ensure that the test of specificity will never be satisfied. The majority decision has provided for qualified immunity until a judicial decision writes detailed instructions for social workers on how to interrogate children in cases of suspected sexual abuse. There probably never will be such a case, because judicial decisions ordinarily do not write methodology guides for various kinds of public officials. What we ordinarily do in cases is decide whether, in particular factual circumstances, official conduct violated the constitution, leaving the writing of how-to-do-it pamphlets to those in the profession.
 
 
 73
 The operation of the qualified immunity standard, shielding government officials from civil liability when they do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known,"[16] "depends substantially upon the level of generality at which the relevant `legal rule' is to be identified."[17] Any rule can be stated too generally, so that it does not really bear on whether a reasonable officer attempting to act lawfully would have known better than to violate it in the circumstances.[18] It can also be stated too specifically. As Lanier establishes, welfare workers could say "there is no case prohibiting welfare workersfrom selling children into slavery," or a judge could say "there is no case saying that a litigant is deprived of due process when the judge sexually assaults her," yet the predicates, absence of any case law governing similar circumstances, would not justify qualified immunity.
 
 
 74
 In the case at bar, by demanding the impossible -case law that writes a how-to-do-it book -and ignoring clearly established law on analogous circumstances, the social workers demand more specificity than they are entitled to. The question always comes down to whether they should have known better whether "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."[19] It did not take any case law at all to establish that the judge in Lanier deprived a litigant with a custody case pending before him of due process when he sexually assaulted her. Likewise, in Schwenk v. Hartford,[20] we held that a prison guard was not entitled to qualified immunity against a complaint alleging that he tried to compel a prisoner to engage in sex with him, because any reasonable prison guard would realize that sexual abuse of prisoners violated the Eighth Amendment, and "no case is necessary to establish the truth of the underlying proposition." By contrast, in Wilson v. Layne,[21] even though there was case law bearing on whether police could invite reporters along when they executed a search warrant, it was too confusing and uncertain to make it apparent to them that they were violating a constitutional right of the persons searched." `[W]hen the defendant's conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous preexisting case law is not required to show that the law is clearly established."[22]
 
 
 75
 The rights Devereaux claims the social workers deprived him of fall within the general prohibition, "nor shall any State deprive any person of . . . liberty . . . without due process of law." Devereaux was indisputably deprived of liberty; he was in jail for substantial periods repeatedly for more than a year on trumped up charges of raping children. The proper question to ask, under Anderson and Lanier , is whether the defendants violated his right to due process of law by acting in a way that reasonable persons in their position would have known violated a clearly established right.
 
 
 76
 Devereaux presents evidence that defendants used coercion to make witnesses lie in order to establish that he had committed crimes of which he was innocent. His evidence also supports the inference that defendants knew that the evidence they obtained by coercion was false. As a matter of common sense it should be apparent to any reasonable government official of any sort -police officer, social work investigator, or any other -that coercing witnesses to lie to support accusations against a person would deprive the victim of a clearly established constitutional right to fair procedure, that is due process. The underlying rule, "You shall not bear false witness against your neighbor," is well established indeed,[23] and could not be a surprise to anyone. In its obviousness, the question whether the conduct violated a clearly established constitutional right in a case where a person is "framed" by government officials is analogous to the one in Lanier, whether a judge ought to know that the due process a civil litigant is entitled to includes the right not to be sexually assaulted by the judge. It should be apparent to any government official,social worker or not, whether the case involves foster children or adults, whether it involves sexual molestation or any other crime, that it is profoundly wrong to "frame" someone, that is, to "concoct a false charge or accusation."[24]
 
 
 77
 Even if a person's constitutional right not to be "framed" were not so clear as not to need a case in point, defendants would still not be entitled to qualified immunity. There is a case in point, Pyle v. Kansas.[25] It is established law that when a government official coerces a witness to provide what the government official knows is false evidence against a person, to be used in a criminal prosecution, the official violates the due process rights of the person against whom the false evidence is to be used. The Supreme Court held in Pyle v. Kansas that "perjured testimony knowingly used by the state authorities to sustain his conviction" and "deliberate suppression by these same authorities of evidence favorable to him" violates the Constitution.[26] In Pyle, as here, the victim of the constitutional abuse presented evidence that the authorities coerced vulnerable people to tell lies in order to convict him of a crime that he did not commit. Pyle held that either of two acts, deliberate suppression of evidence favorable to a defendant, or knowing use of perjured testimony to obtain a conviction, violated the constitution[27].
 
 
 78
 The majority opinion concedes that "the constitutional right to be free from the knowing presentation of false or perjured evidence in a criminal prosecution is clearly established."[28] There are two reasons why we reach different conclusions about whether this right entitles Devereaux to sue defendants. First, the majority distinguishes a Tenth Circuit case, Snell v. Tunnell,[29] which holds that social workers do not have qualified immunity when they use false evidence in a child sex abuse case, on the basis that "Nor is there any evidence tending to show that the individual Defendants deliberately fabricated evidence of child sexual abuse in order to cause Devereaux cognizable harm."[30] As explained above, I think Devereaux's evidence suffices to make a case that defendants did fabricate evidence, by coercing the child witnesses to lie, in order to get Devereaux arrested and to remove the children from his home, so the conclusion the Tenth Circuit reaches applies here as well. Second, the majority cites cases from the other circuits for the proposition that "there is no clearly established constitutional norm for interviewing child witnesses especially when they initially deny abuse."
 
 
 79
 Of these cases, Doe v. State of Louisiana,[31] is distinguishable because no criminal prosecution was involved and for other reasons, and could not be followed in this circuit regardless, because it conflicts with our decision in Wallis v. Spencer[32]. Darryl H. v. Coler[33] involved physical examinations of children to determine whether they were abused, not coercion of children to provide false evidence, so has no bearing on this case. Myers v. Morris,[34] arising out of the bizarre prosecutions in Jordan,Minnesota in 1983-84 does speak broadly about the uncertainty of the law regarding interrogation of children in sex abuse cases, but the facts as described in that case lack the critical element this one has, that the defendants who questioned the children knew or should have known that they were eliciting false accusations.
 
 
 80
 Use of children to satisfy adults' sexual cravings is a gravely serious crime, subject to very severe penalties. Manufacturing false evidence and using the criminal law system to ruin the lives of innocent people is also a gravely serious wrong. The more terrible the crime and penalties, the more terrible is the wrong of "framing" someone for it. The seriousness of a crime never justifies manufacturing evidence and convicting the innocent. Our system of justice does not allow for the position taken by the notorious Crusader general, "kill them all, God will know his own."[35] A number of towns in the 1980's and 1990's appear to have been engulfed by some sort of hysteria among government officials about sex and children. Wenatchee Washington may be among them. Its newly appointed child abuse detective on his first child sex molestation case, together with its much more experienced social workers, and its prosecutors, filed 29,727 charges of child abuse against 43 men and women. At the end of it all, though, few stood up in court except against the government's own witness, Linda Miller, the woman whose implausible (and, as soon proved, impossible) story of sex orgies lay at the foundation of the charges against many or most of the others. Devereaux eventually was allowed to plead guilty to a minor misdemeanor without any sexual connotation, for spanking a child on the buttocks with an open hand. Many of the others convicted in the Wenatchee sex prosecutions have had their convictions overturned on appeal. The Washington Court of Appeals has appointed a judge to conduct a formal inquiry into what went wrong in its criminal justice system. The affair has been popularly regarded as a Northwestern Salem, though it seems to have been more an official than a popular mania.[36]
 
 
 81
 The doctrine of qualified immunity is useful when it enables government officials to do their duty with vigor, unafraid of enmeshment in lawsuits about new, doubtful or unclear constitutional claims they had no reason to know about. The doctrine would be harmful rather than useful if it protected government officials who deprived people of such fundamental and well known constitutional rights as the right not to have government officials manufacture false evidence against them. The vulnerability of government officials to lawsuits if they intentionally deprive people of their plain constitution rights is an important deterrent to official abuse of individual rights. Nor can officials be immunized because they act with good underlying motives, such as to protect children from sexual exploitation. "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."[37]
 
 
 
 Notes:
 
 
 [1]
 Cf. Wallis v. Spencer, 202 F.3d 1126 (9th Cir. 2000).
 
 
 [2]
 Barbara A. Morse, Information Processing: Identifying the Behavior Disorders of Fetal Alcohol Syndrome, in Fantastic Antone Succeeds:
 Experiences in Educating Children with Fetal Alcohol Syndrome 26-27 (1993, Judith S. Kleinfeld and Siobhan Wescott, editors).
 
 
 [3]
 Anderson v. Creighton, 483 U.S. 511, 526 (1987).
 
 
 [4]
 Id.
 
 
 [5]
 Harlow v. Fitzerald, 457 U.S. 800, 817 (1982).
 
 
 [6]
 Id. at 819.
 
 
 [7]
 520 U.S. 259 (1997).
 
 
 [8]
 Id. at 261.
 
 
 [9]
 Id. at 271.
 
 
 [10]
 Wilson v. Layne, 526 U.S. 603 (1999).
 
 
 [11]
 Harlow, 457 U.S. at 817.
 
 
 [12]
 Lanier, 520 U.S. at 271.
 
 
 [13]
 Maj. Op. at 1053.
 
 
 [14]
 Maj. Op. at 1053.
 
 
 [15]
 Maj. Op. at 1053.
 
 
 [16]
 Harlow, 457 U.S. at 817.
 
 
 [17]
 Anderson v. Creighton, 483 U.S. 635, 639 (1987).
 
 
 [18]
 Id.
 
 
 [19]
 Anderson, 483 U.S. at 526.
 
 
 [20]
 204 F.3d 1187 (9th Cir. 2000).
 
 
 [21]
 526 U.S. 603 (1999).
 
 
 [22]
 Mendoza v. Block, 27 F3d 1357,61 (9th Cir. 1994).
 
 
 [23]
 Exodus 20:13.
 
 
 [24]
 Compact Oxford English Dictionary 2d ed. page 630 (1991).
 
 
 [25]
 317 U.S. 213 (1942).
 
 
 [26]
 Id. at 216.
 
 
 [27]
 Id. See also Snell v. Tunnel , 920 F.2d 673 (10th Cir.), cert. denied, 499 U.S. 976 (1990) (holding that child care workers who deliberately fabricated allegations of child prostitution and pornography in order to have the children removed from foster care pursuant to a court order are not entitled to qualified immunity).
 
 
 [28]
 Maj. Op. at 1055.
 
 
 [29]
 902 F.2d 673 (10th Cir.) cert. denied, 499 U.S. 976 (1990).
 
 
 [30]
 Maj. Op. at 1056.
 
 
 [31]
 2 F.3d 1412 (5th Cir. 1993).
 
 
 [32]
 202 F.3d 1126 (9th Cir. 2000).
 
 
 [33]
 801 F.2d 893 (7th Cir. 1986).
 
 
 [34]
 810 F.2d 1437 (8th Cir. 1987).
 
 
 [35]
 Albigensian Crusade, http://crusades.idbsu.edu/Albi/.
 
 
 [36]
 See Dorothy Rabinowitz, Reckoning in Wenatchee, The Wall Street Journal, September 21, 1999. "The 1994-95 child sex abuse witch-hunt in Wenatchee, Wash., resulted in a massive frame-up. " Paul Craig Roberts, Save by Pursuit of the Truth, The Washington Times, April 6, 2000; Mike Barber, Wenatchee Haunted By Investigations, Seattle Post-Intellingencer, September 10, 1999. Friel stated that "no rational trier of fact wold believe these allegations." Rabinowitz, Reckoning in Wenatchee, The Wall Street Journal, September 21, 1999.
 
 
 [37]
 Olmstead v. United States, 277 U.S. 438, 479 (1928).