263 F.3d 1070 (9th Cir. 2001)
 ROBERT DEVEREAUX, PLAINTIFF-APPELLANT,
v.
TIMOTHY DAVID ABBEY; LAURIE ALEXANDER; KATE CARROW; LINDA WOOD; KENNETH BADGLEY, IN HIS OFFICIAL CAPACITY AS CHIEF OF POLICE OF THE CITY OF WENATCHEE; WASHINGTON STATE DEPT OF SOCIAL AND HEALTH SERVICES; ROBERT RICARDO PEREZ, OPINION DEFENDANTS-APPELLEES,
And
EARL TILLY, IN HIS OFFICIAL CAPACITY AS PUBLIC SAFETY COMMISSIONER FOR THE CITY OF WENATCHEE; CITY OF WENATCHEE, A MUNICIPAL CORPORATION, DEFENDANTS.
 No. 97-35781
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted March 20, 2001
Filed September 5, 2001
 
 [Copyrighted Material Omitted]
 Steven C. Lacy, East Wenatchee, Washington, for the plaintiff-appellant.
 Jeff Freimund, Assistant Attorney General, Olympia, Washington, for the defendants-appellees.
 Appeal from the United States District Court for the Eastern District of Washington Robert H. Whaley, District Judge, Presiding D.C. No. CV 96-0115 RHW
 Before: Mary M. Schroeder, Chief Judge, and Harry Pregerson, Diarmuid F. O'Scannlain, Ferdinand F. Fernandez, Thomas G. Nelson, Andrew J. Kleinfeld, A. Wallace Tashima, Sidney R. Thomas, Kim McLane Wardlaw, Richard A. Paez, and Johnnie B. Rawlinson, Circuit Judges.
 Opinion by Judge Tashima; Concurrence by Judge Fernandez; Partial Concurrence and Partial Dissent by Judge Kleinfeld
 Tashima, Circuit Judge.
 
 
 1
 Plaintiff Robert Devereaux brought suit in federal district court for alleged violations of his federal civil rights, and also on various state law grounds. The district court granted summary judgment in favor of all defendants as to the federal claims and then declined to exercise supplemental jurisdiction over the state law claims, dismissing them without prejudice. This timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, and we affirm.
 
 I. BACKGROUND
 
 2
 This case arises out of the investigation and prosecution of Devereaux for alleged sexual abuse of foster children living in his home, an investigation that mushroomed into a sexual abuse "witch hunt" in which 43 adults were charged with over 29,000 counts of sexual molestation. We summarize the pertinent facts only briefly. The facts are set forth in detail in the three-judge panel opinion. See Devereaux v. Perez, 218 F.3d 1045, 1047-51 (9th Cir.), reh'g en banc granted , 235 F.3d 1206 (9th Cir. 2000) ("Devereaux I").
 
 
 3
 On August 3, 1994, Detective Robert Ricardo Perez of the Wenatchee, Washington, Police Department interviewed A.R., a foster child of Devereaux's, to determine whether A.R. was being sexually abused by Devereaux. A.R. initially denied that she was being abused but, upon further questioning, went on to tell Perez that she had been both a victim of and a witness to sexual abuse by Devereaux. On this basis, Perez brought Devereaux to the police station for questioning. Perez interviewed Devereaux about the alleged abuse, and Devereaux denied that he had sexually abused any of his foster children.
 
 
 4
 While Perez was interviewing Devereaux, DefendantAppellee Linda Wood, an employee of the Washington Department of Social and Health Services ("DSHS"), arrived at the police station with A.S., another of Devereaux's foster children. Perez briefly interrupted his interview with Devereaux to talk to A.S., who denied that there was any sexual abuse taking place in the Devereaux home. Perez then finished his interview with Devereaux and had him booked on one count of rape of a child in the third degree, on the basis of the alleged abuse of A.R.
 
 
 5
 Later on the same day, Perez also interviewed two more of Devereaux's foster children and, with Wood, conducted a lengthy second interview of A.S. This interview lasted from 5:00 p.m. to 11 p.m. In it, A.S. repeatedly denied having been sexually abused by Devereaux. After six hours of questioning, however, she finally changed her story and said that he had abused her. Perez then had Devereaux booked for the rape and molestation of A.S.
 
 
 6
 From there the investigation grew and the accusations spread. Roughly one year later, the felony charges against Devereaux were dropped in exchange for his plea of guilty to two misdemeanor counts -one count of rendering criminal assistance and one count of fourth-degree assault (for having spanked one of his foster children). The conditions of his sentence prohibited him from having contact with certain children, from being a foster parent for two years, and from being employed in a field that caters to or has regular contact with minor children.
 
 
 7
 Devereaux then commenced this action under 42 U.S.C. §§ 1983, naming the following parties as defendants: Perez; Wood; DSHS; the City of Wenatchee; Timothy David Abbey, Laurie Alexander, and Kate Carrow, all of whom were employees of DSHS; Kenneth Badgley, in his official capacity as police chief for the Wenatchee Police Department; and Earl Tilly, the Wenatchee Public Safety Commissioner. Devereaux alleged violations of his federal rights and also brought several state law claims.
 
 
 8
 The defendants moved for summary judgment on the §§ 1983 claim, and the district court granted their motions. It declined to exercise supplemental jurisdiction over the state law claims, dismissing them without prejudice to their being prosecuted in state court. See 28 U.S.C.§§ 1367(c). This timely appeal followed. A divided panel of this court affirmed the district court. See Devereaux I, 218 F.3d at 1045. We subsequently granted rehearing en banc. 235 F.3d at 1206.
 
 
 9
 Pursuant to a settlement agreement, Devereaux's appeal with respect to Perez and Badgley was dismissed with prejudice. In addition, Devereaux has not challenged the dismissal of the state law claims or the grant of summary judgment in favor of the City of Wenatchee, DSHS, or Tilly.
 
 
 10
 Consequently, the only matter now before this court is Devereaux's challenge to the grant of summary judgment in favor of Abbey, Alexander, Carrow, and Wood (hereinafter "Defendants") on the §§ 1983 claim. The district court granted summary judgment to Defendants on that claim on the basis of qualified immunity, stating that Devereaux has"not cite[d], nor has this Court's research revealed, case law to suggest that any of the State Defendants violated Plaintiff's clearly established rights based upon the evidence in the record."
 
 II. STANDARD OF REVIEW
 
 11
 We review a grant of summary judgment de novo. Weiner v. San Diego County, 210 F.3d 1025, 1028 (9th Cir. 2000). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).
 
 III. DISCUSSION
 
 12
 Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights. 42 U.S.C.§§ 1983. Qualified immunity, however, shields §§ 1983 defendants "[f]rom liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).
 
 
 13
 In Saucier v. Katz, 121 S. Ct. 2151 (2001), the Supreme Court clarified the two-step qualified immunity inquiry. To decide whether a defendant is protected by qualified immunity, a court must first determine whether, "[t]aken in the light most favorable to the party asserting injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Id. at 2156. If the plaintiff's factual allegations do add up to a violation of the plaintiff's federal rights, then the court must proceed to determine whether the right was"clearly established," i.e., whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. Id. In essence, at the first step, the inquiry is whether the facts alleged constitute a violation of the plaintiff's rights. If they do, then, at the second step, the question is whether the defendant could nonetheless have reasonably but erroneously believed that his or her conduct did not violate the plaintiff's rights. See id. at 2158 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.").
 
 
 14
 Undertaking the first step of the two-step qualified immunity inquiry, we are persuaded that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. Perhaps because the proposition is virtually self-evident, we are not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right. Rather, what is required is that government officials have "fair and clear warning" that their conduct is unlawful. See United States v. Lanier, 520 U.S. 259, 271 (1997) (noting that "general statements of the law are not inherently incapable of giving fair and clear warning," and that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though `the very action in question has [not ] previously been held unlawful' " (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alteration in original)); see also Giebel v. Sylvester, 244 F.3d 1182, 1189 (9th Cir. 2001) ("Precedent directly on point is not necessary to demonstrate that a right is clearly established. Rather, if the unlawfulness is apparent in light of pre-existing law, then the standard is met. In addition, even if there is no closely analogous case law, a right can be clearly established on the basis of common sense. " (emendations, internal quotation marks, and citations omitted)).
 
 
 15
 Under Pyle v. Kansas, 317 U.S. 213, 216 (1942), the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction violates the Constitution. While Pyle does not deal specifically with the bringing of criminal charges, as opposed to the securing of a conviction, we find that the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and Pyle is sufficiently analogous, that the right to be free from such charges is a constitutional right.
 
 
 16
 We are also persuaded, however, that there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way. Interviewers of child witnesses of suspected sexual abuse must be given some latitude in determining when to credit witnesses' denials and when to discount them, and we are not aware of any federal law -constitutional, decisional, or statutory -that indicates precisely where the line must be drawn. See generally Myers v. Morris, 810 F.2d 1437, 1460-61 (8th Cir. 1987) (discussing in detail this "grey area of investigative procedure as to which there were, and probably still are, less than clearly established legal norms"). Cf. Idaho v. Wright, 497 U.S. 805, 819 (1990) (noting, in a Confrontation Clause context, that "[a]lthough the procedural guidelines propounded by the court below may well enhance the reliability of out-of-court statements of children regarding sexual abuse, we decline to read into the Confrontation Clause a preconceived and artificial litmus test for the procedural propriety of professional interviews in which children make hearsay statements against a defendant"). Consequently, mere allegations that Defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under §§ 1983.
 
 
 17
 Given this legal background, the central issues presented on this appeal are the following: (1) Did Devereaux properly present to the district court and to this court a deliberate fabrication-of-evidence claim, or merely an improperinterview-techniques claim? (2) If the former, has Devereaux adduced sufficient evidence in support of such a claim to withstand summary judgment?For the reasons given below, we conclude that, to the extent that Devereaux has raised a deliberate-fabrication-ofevidence claim, he has not adduced or pointed to any evidence in the record that supports it. For purposes of our analysis, we assume that, in order to support such a claim, Devereaux must, at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of Devereaux despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. See Devereaux I, 218 F.3d at 1063 (Kleinfeld, J., dissenting) (describing the "critical element" in Devereaux's deliberatefabrication-of-evidence claim, namely, "that the defendants who questioned the children knew or should have known that they were eliciting false accusations"); see also Myers, 810 F.2d at 1458 (requiring, in an analogous context,"a specific affirmative showing of dishonesty").
 
 
 18
 A. Devereaux's Arguments Before the District Court
 
 
 19
 The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of fact for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the nonmoving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325; see also Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 532 (9th Cir. 2000) (holding that the Celotex "showing" can be made by "pointing out through argument -the absence of evidence to support plaintiff's claim"). Once the moving party carries its initial burden, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleading," but must provide affidavits or other sources of evidence that "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Celotex, 477 U.S. at 323-24; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1107 (9th Cir. 2000) (holding that once the moving party carries its initial burden of production, "the nonmoving parties were obligated to produce evidence in response").
 
 
 20
 In their memorandum in support of their motion for summary judgment, Defendants argued that "there is no evidence that any of the defendant[s] actually believed plaintiff was innocent or that the children were lying when they participated in the interviews." On this basis (among others), Defendants argued that they were entitled to summary judgment.
 
 
 21
 In his memorandum in opposition to Defendants' motion for summary judgment, Devereaux never expressly accepted or rejected the proposition that his §§ 1983 claim required a showing of dishonesty, and he never purported to have made such a showing. Most of his memorandum indicated that Devereaux was raising only an improper-interviewtechniques claim. For example, he asserted that Defendants failed "to adhere to established guidelines and policies concerning the questioning of child witnesses," and that they departed "from accepted professional judgment, practice, and standards." He also claimed that "[w]hat is at issue for this action is the failure of the State Defendants to conduct and monitor these interrogations in a manner that would ensure the veracity of the information obtained." All of those allegations, even if supported by record evidence, are insufficient to support a deliberate-fabrication-of-evidence claim. Failing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result is one thing; intentionally fabricating false evidence is quite another.
 
 
 22
 Devereaux did, however, go on to claim that Defendants' "intentional attempt to alter the testimony of alleged child victims" was also "at issue." He did not, however, expressly develop that "issue" or connect it with other, more specific factual allegations, or with any record evidence. His "Statement of Material Facts" in opposition to Defendants' motion for summary judgment contains several descriptions of interviews of children in which the children initially denied abuse, were questioned further, and ultimately accused Devereaux of abusing them. These, as far as we can discern, are the only "attempts to alter the testimony of alleged child victims" to which Devereaux referred.
 
 
 23
 The problem with Devereaux's line of argument is that, as we noted earlier, interviewers of child witnesses of suspected sexual abuse must be permitted to exercise some discretion in deciding when to accept initial denials at face value and when to reject them (or withhold judgment on them) and proceed further. Consequently, an allegation that an interviewer disbelieved an initial denial and continued with aggressive questioning of the child cannot, without more, support a deliberate-fabrication-of-evidence claim, even if the allegation is amply supported by the evidence. What is required is an allegation or a showing that the interviewer knew or should have known that the alleged perpetrator was innocent, or that the interview techniques employed were so coercive and abusive that the interviewer knew or should have known that they would yield false information. Devereaux never even alleged facts of this sort, much less supported such allegations with citations to evidence in the record.
 
 
 24
 An example will illustrate the point. In his memorandum submitted to the district court, Devereaux emphasized the fact that in the August 3 interview of A.S., in which A.S. initially denied being a victim of abuse but later changed her story and accused Devereaux, Wood repeatedly admonished A.S. to tell the truth. It is difficult to see, however, how repeated admonitions to be truthful can amount to a constitutional violation for deliberate fabrication of evidence, in the absence of any independent allegations or evidence that Wood knew or should have known that Devereaux was innocent and that A.S., in testifying to that effect, had already told the truth. Because Devereaux never made that independent argument, his complaints about Wood's admonitions to the child to tell the truth cannot support a deliberate-fabrication claim. For similar reasons, the other incidents that Devereaux described before the district court also are inadequate to support such a claim.
 
 
 25
 Thus, to the extent that Devereaux's memorandum in opposition to Defendants' motion for summary judgment did raise a deliberate-fabrication-of-evidence claim, he failed to make or support any factual allegations that were logically capable of supporting such a claim. The district court's decision to grant the motion was therefore proper.
 
 B. Devereaux's Opening Brief
 
 26
 "It is well-established that an appellate court will not consider issues that were not properly raised before the district court." Slaven v. American Trading Transp. Co., 146 F.3d 1066, 1069 (9th Cir. 1998). Although our discussion above demonstrates that Devereaux barely presented and never supported his deliberate-fabrication-of-evidence claim before the district court, we nonetheless discuss the additional arguments that he has raised on appeal. As that discussion shows, his failure to allege and to offer proof of the requisite facts continues.
 
 
 27
 In his opening brief on appeal, Devereaux generally argues only that Defendants used improper methods in interviewing witnesses. He never argues that they pursued their investigation of him even though they knew or should have known that he was innocent. The closest that he comes to making such an argument is a vague reference to "evidence that the state defendants . . . held an animus and preconception against Devereaux which led to their intentional manipulation of child witnesses." But the "animus and preconception " referred to could just as well be Defendants' good-faith belief that Devereaux was guilty, which could lead to aggressive or manipulative questioning of the child witnesses in order to get them to testify truthfully, if reluctantly, to his guilt. We conclude that if Devereaux's brief is intended to raise a deliberate-fabrication-of-evidence claim, it is not based on any allegation that Defendants knew or should have known that he was innocent.[1]
 
 
 28
 Thus, if there is a deliberate-fabrication-of-evidence argument in Devereaux's opening brief on appeal, then it must be based on a claim that Defendants' interviewing techniques were so coercive and abusive that Defendants knew or should have known that the interviews would yield false information. Liberally construed, Devereaux's brief does raise this argument: It includes a discussion of Pyle, and it makes repeated reference to "coerc[ion] or influence[ ] to provide false testimony," and the like.
 
 
 29
 The problem once again, however, is that the improprieties Devereaux describes cannot possibly support his claim. The alleged improprieties are well described and addressed in the panel opinion. See Devereaux I, 218 F.3d at 1054-55. For example, Devereaux repeatedly focuses on the interview in which Perez, in Carrow's presence, confronted A.R. regarding her prior recantation of her allegations of abuse and threatened her with charges for "false reporting" if she stuck to her recantation. Devereaux emphasizes the fact that A.R. suffers from fetal alcohol syndrome and is therefore a particularly vulnerable witness. What Devereaux mentions only in passing is that, despite the coercive nature of the threat and despite A.R.'s heightened susceptibility, A.R. stuck to her recantation -Devereaux expressly recognizes that Perez " unsuccessfully applied pressure upon A.R." by threatening "to prosecute her for perjury." (Emphasis added.) Because this coercive technique did not, on Devereaux's theory of the facts, yield any false testimony even though it was applied to an especially vulnerable witness, it can hardly serve as a basis for a claim that Defendants violated Devereaux's rights by using techniques that they knew or should have known would yield false information.
 
 
 30
 We conclude that to the extent that Devereaux has raised a deliberate-fabrication-of-evidence claim in his opening brief, he has again failed to allege facts that would support such a claim. The grant of summary judgment in favor of Defendants must therefore be affirmed.
 
 C. Devereaux's Supplemental Brief
 
 31
 When we granted rehearing en banc, we ordered supplemental briefing from the parties. As a general matter, "[w]e review only issues which are argued specifically and distinctly in a party's opening brief," Greenwood v. FAA, 28 F.3d 971, 977 (9th Cir. 1994), and an issue will therefore be deemed waived if it is raised for the first time in a supplemental brief, Kreisner v. City of San Diego, 1 F.3d 775, 778 n.2 (9th Cir. 1993). Despite these well-established principles and the fact that Devereaux's opening brief did not contain any meritorious arguments for reversal, we briefly address the arguments in his supplemental brief.
 
 
 32
 In his supplemental brief, Devereaux sensibly adopts the deliberate-fabrication-of-evidence argument that was so forcefully developed by Judge Kleinfeld in his dissent from the panel majority's opinion. See Devereaux I , 218 F.3d at 1057-63 (Kleinfeld, J., dissenting). Nonetheless, Devereaux still fails to allege any facts or point to any evidence in the record that supports the argument.
 
 
 33
 For example, Devereaux points out that Carrow was involved in the "parade of homes," an incident in which one of Devereaux's foster children was driven around Wenatchee and asked to point out the locations at which abuse had occurred. But driving a child around the community and asking where the crimes that the child allegedly witnessed took place is surely not such a coercive and abusive technique that Carrow should have known it would lead to false information. Devereaux points out that Carrow "ignored" another child's denials that Devereaux was abusing his foster children, but, again, interviewers of child witnesses of suspected sexual abuse surely must be given some latitude in determining when to credit witnesses' denials and when to discount them -the mere fact that an interviewer did not immediately believe such a denial cannot suffice to show that the interviewer violated the Constitution by using techniques that the interviewer knew or should have known would yield false information.
 
 
 34
 Devereaux also accuses Carrow of withholding exculpatory evidence, but (1) he does not argue that the requirements of Brady v. Maryland, 373 U.S. 83 (1963), apply to social workers at the investigative and charging stages, and (2) in any event, a Brady violation cannot in itself support a deliberatefabrication-of-evidence claim -if it did, then any prisoner with a successful Brady claim would be able to bring a §§ 1983 action against the prosecutor for deliberate fabrication of evidence, and would be able to get past summary judgment. The other accusations against Carrow are even less substantial than these.
 
 
 35
 Devereaux's only accusation regarding Wood is her participation in the "tell the truth" interview of A.S., which we have already addressed.
 
 
 36
 Devereaux points out that Alexander participated in the "parade of homes" as well, that she withheld exculpatory information, and that she used Linda Miller's confession in questioning Miller's daughter. None of this shows, however, that Alexander knew or should have known that Devereaux was innocent, and none of it amounts to the use of investigative techniques that were so coercive and abusive that Alexander knew or should have known that they would yield false information.
 
 
 37
 The only accusation that Devereaux levels against Abbey is that he participated in Perez's interview of D.E. after D.E. had been in Perez's foster care for six months. Without more, that does not show that Abbey knew or should have known that Devereaux was innocent, or that he used techniques that he knew or should have known would yield false information.
 
 
 38
 Again, Devereaux has not alleged that Defendants knew or should have known that he was innocent, or that their investigative techniques were so coercive and abusive that they knew or should have known that the techniques would yield false information. He has therefore failed, even in his supplemental brief, to support a claim that Defendants deliberately fabricated evidence to be used against him.
 
 D. The Partial Dissent
 
 39
 The partial dissent agrees that in order to support a deliberate-fabrication claim, Devereaux must show more than "that an interviewer disbelieved an initial denial and continued with aggressive questioning." Kleinfeld, J., dissenting in part at 12226 ("partial dissent"). The partial dissent's analysis of the evidence, however, is inconsistent with that requirement.
 
 
 40
 As part of its case against Wood, the partial dissent describes deposition testimony from A.S.'s mental health counselor to the effect that A.S. had threatened, on numerous occasions, to accuse the counselor of abusing her. Id. at 12228-29. The partial dissent fails to acknowledge, however, that the deponent was asked whether A.S. appeared to be capable of carrying out such a threat, but that the answer to that question was not included in the deposition excerpt that was provided to the district court and to this court. Most importantly, there is no evidence that Wood was aware of any of this, or even that the deponent had ever told anyone, let alone Wood, about any of A.S.'s threats. For all we know, the deponent never took the threats seriously enough to think them worth reporting.
 
 
 41
 The partial dissent also states that "in a later interview" A.S. both accused another social worker of participating in the alleged orgies and admitted having made false accusations of rape. The partial dissent concludes that "[a ] reasonable interviewer would have to be very wary indeed of accusations of sexual misconduct by this dangerous girl." Id. at 12229. The "later interview" in question was conducted by Devereaux's attorney and took place on June 26, 1995, nearly one year after Wood's allegedly improper interview of A.S., and approximately four months after Devereaux filed his complaint. The partial dissent fails to explain how A.S.'s statements in June 1995 should have made Wood aware in August 1994 of A.S.'s supposed "dangerousness."[2]
 
 
 42
 Apart from these unsupported or irrelevant allegations, the case against Wood comes to this: (1) A.S. initially did not accuse Devereaux, (2) she was subsequently left alone with Wood, and then, (3) after a lengthy interrogation by Wood and Perez, she accused Devereaux. The partial dissent notes that Devereaux, as the nonmoving party, is entitled to all reasonable inferences in his favor. It then concludes that a jury could infer that "Wood knew the story was false. " Id. at 12229.
 
 
 43
 There are several problems with this line of reasoning. The first is that a jury would be authorized to draw such an inference any time an interviewer discounts an initial denial and continues with aggressive questioning that produces an accusation -indeed, that is all that the inference would be based on in this case. Were we to reverse the grant of summary judgment as to Wood, then, we would thereby eliminate completely any latitude that interviewers of child victims of suspected sexual abuse must have, because pressing on past an initial denial would always give rise to potential liability. This we cannot do. Errors of this kind -inferring deliberate fabrication from the fact that an investigator discounted a witness's statement and pressed on -also occur elsewhere in the partial dissent's analysis. See, e.g., id. at 12233 (permitting the jury to infer that "Carrow . . . knew that Perez was making all the children lie" from the fact that A.R. said to Perez "you make all the children lie").[3]
 
 
 44
 Second, as we explained, supra, Devereaux has never alleged that Wood or any other Defendant knew that he was innocent. His claim must therefore be based entirely on improper interviewing techniques, i.e., techniques that are inherently so coercive or abusive as to give rise to liability even if used in good faith. By repeatedly basing its arguments on inferences to "guilty knowledge" on the part of Defendants, see id. at 12229-30 (Wood); id. at 12232, 12234 (Carrow); id. at 12235 (Alexander), the partial dissent grounds its analysis upon factual allegations that Devereaux has never made.[4]
 
 
 45
 Other, similar problems pervade the remainder of the partial dissent's analysis. For example, it discusses the interview in which Perez, with Carrow present, threatened A.R. with charges for false reporting. It concludes that a jury could draw inferences on this basis about Carrow's "modus operandi," to the effect that she "had probably used similarly coercive techniques" in other interviews with other girls. Id. at 12233. The flaw in this reasoning is that there is no evidence that Carrow has ever used this "coercive" technique (i.e., the making of threats), or any other, on anyone, including A.R. All that the record shows is that on one occasion Carrow was present when someone else used threats -we do not even have any evidence that Carrow approved use of the technique. How this evidence shows that the use of threats and "similarly coercive techniques" was Carrow's "modus operandi" has been left unexplained.
 
 
 46
 The partial dissent's case against Alexander is that, having received medical evidence that C.M. might have been abused but not to the full extent that C.M. claimed, Alexander subsequently "obtained reconfirmation" of C.M.'s story, in part by truthfully informing C.M. that C.M.'s mother had told a similar story. Id. at 12235.
 
 
 47
 At the time of this incident, Alexander had reason to believe that C.M. had been abused (because her hymen was partially torn and she had made allegations of abuse), but Alexander also had reason to believe that C.M.'s story could not be true in its entirety (because the condition of C.M.'s hymen was not consistent with the full extent of the abuse she had alleged). Notwithstanding the partial dissent's conclusions to the contrary, truthfully informing a witness about another witness' corroboration is not such an inherently coercive or abusive technique that Alexander knew or should have known it would lead to false information -rather, Alexander could have reasonably believed that by taking C.M.'s side, so to speak, she could gain C.M.'s trust and persuade her to describe what sort of abuse had really taken place. This may or may not be the wisest approach to a witness whose story has already been falsified in part, but it cannot serve as the foundation for a deliberate-fabrication-of-evidence claim.
 
 
 48
 Devereaux has had ample opportunity to marshal his evidence and focus his arguments on Defendants, rather than on Perez. If the partial dissent's observation that the"record and briefs are not as clear as we might like" because"the case was focused on Detective Perez," id. at 12227, is meant to excuse Devereaux's failure to marshal the evidence against Defendants, we are unpersuaded. In the district court, Abbey, Alexander, Carrow, and Wood moved for summary judgment separately from Perez. Devereaux then filed a memorandum in opposition to their motion separately from his opposition to Perez's motion. Devereaux has repeatedly been put on notice that he must present and argue the evidence against Defendants. If his case was "focused" on Perez, it was only because the only evidence Devereaux had was against Perez, and he had none against Defendants. In that state of the record, it cannot be gainsaid that the district court correctly granted summary judgment in favor of Abbey, Alexander, Carrow, and Wood.
 
 
 49
 One final point merits emphasis: The partial dissent does not purport to present arguments that it finds in Devereaux's pleadings and briefs. Rather, it creates the factual allegations that Devereaux needs and then proceeds directly to the record, mining it for evidence to support the necessary allegations. We reject this approach for the simple reason that we are not Devereaux's attorneys. It is not the role of this court to "manufacture arguments for an appellant." Greenwood, 28 F.3d at 977.
 
 IV. CONCLUSION
 
 50
 The investigatory behavior of which Devereaux complains is indeed troubling, and we do not condone it. But, in three attempts to do so, Devereaux has never made or provided evidentiary support for allegations that warrant the imposition of §§ 1983 liability on Defendants. The judgment of the district court is, therefore,
 
 
 51
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 In this regard, it is worth noting that the medical examination of Linda Miller's daughter, which allegedly showed that Miller's allegations of abuse could not be true, took place after nearly all of the allegedly improper conduct of which Devereaux complains. Thus, even if the medical falsification of Miller's story proved that Devereaux was innocent (rather than just proving that Miller's story, or certain parts of it, were false), it happened too late to serve as evidence that Defendants knew Devereaux was innocent when they engaged in the conduct of which he complains.
 
 
 [2]
 Similarly, the partial dissent notes, in its case against Wood, that "A.S. had made an allegation against someone in Wood's own office." Id. at 12230. The allegation was made in the same June 1995 interview conducted by Devereaux's attorney. The record of the interview does not indicate that A.S. had ever voiced that allegation before that date.
 
 
 [3]
 We do not suggest that such inferences would, in all circumstances, be unreasonable. What we do hold is that such tenuous inferences, standing alone, do not constitute sufficient evidence to survive summary judgment.
 
 
 [4]
 We return to this point, infra.
 
 
 FERNANDEZ, Circuit Judge, concurring:
 
 52
 I concur in the majority opinion insofar as it rests on the ground of qualified immunity for investigative techniques. I do not, however, join the discussion regarding knowing[1] fabrication of evidence because I do not believe that Devereaux ever properly raised or developed that issue before the district court.
 
 
 53
 Thus, I express no opinion on whether the mere development of evidence (even knowingly false evidence) or the bringing of charges (even knowingly false ones) can by itself constitute a procedural or substantive due process violation within the meaning of the United States Constitution. That kind of conduct would surely be reprehensible, and only a rapscallion in official raiment would do such a thing. However, I would not establish (or refine) a possibly far reaching principle of constitutional law based on the record and presentation in this case.
 
 
 54
 It may be easy to decide the question here, although, as the dissent demonstrates, even that is not necessarily true. But if that right exists, we must answer a number of questions. For example, when does the violation accrue? Is it at the first evil interview, at the first presentation to the prosecutor, at the time charges are filed, at arraignment on those charges, or at some earlier or later point? All of those issues remain to be decided. And when should an officer have had such positive knowledge that the defendant was truly innocent that the further conduct of the investigation, or presentation to the prosecutor, violated the defendant's constitutional rights? The dissent says that the evidence in this case would easily support a jury finding that the defendants have violated the newly delineated right. The majority says that the evidence is not even weighty enough to allow jury consideration. That is to say, no reasonable jury could decide that the right was violated. Given that degree of clarity, I must say that"a [social worker's] lot is not a happy one." W.S. Gilbert & A. Sullivan, The Pirates of Penzance (1879).
 
 
 55
 In short, along with the majority of the original panel, I would hold that Devereaux has not spelled out a constitutional right to have investigations conducted in any particular manner. Devereaux v. Perez, 218 F.3d 1045, 1054 (9th Cir. 2000). I would also declare that to the extent that there may be a constitutional right to be free from the development of knowingly false charges, Devereaux has not properly presented that issue. I would leave it at that.
 
 
 56
 With that caveat, I concur.
 
 
 
 Notes:
 
 
 [1]
 By "knowing" the majority seems to mean knew or should have known.
 
 
 
 57
 KLEINFELD, Circuit Judge, with whom PREGERSON and WARDLAW, Circuit Judges, join, concurring in part, and dissenting in part:
 
 
 58
 Use of children to satisfy adults' sexual cravings is a gravely serious crime, subject to very severe penalties. Manufacturing false evidence and using the criminal law system to ruin the lives of innocent people is also a gravely serious wrong. The more terrible the crime and penalties, the more terrible is the wrong of "framing" someone for it. The seriousness of a crime never justifies manufacturing evidence and convicting the innocent. Our system of justice does not allow for the position taken by the notorious Crusader general, "kill them all, God will know his own."[1]
 
 
 59
 Wenatchee Washington seems to have been among the many towns engulfed by sexual witchhunts in the 1980's and 1990's. Its newly appointed child abuse detective on his first child sex molestation case, together with its much more experienced social workers, and its prosecutors, filed 29,727 charges of child abuse against 43 men and women. At the end of it all, few charges stood up in court except against the government's own witness, Linda Miller, the woman whose implausible (and, as soon proved, impossible) story of sex orgies lay at the foundation of the charges against many or most of the others. Devereaux eventually was allowed to plead guilty to a minor misdemeanor with no sexual connotation, for spanking a disobedient foster child on the buttocks with an open hand. Many of the others convicted in the Wenatchee sex prosecutions have had their convictions overturned on appeal. The Washington Court of Appeals has appointed a judge to conduct a formal inquiry into what went wrong in its criminal justice system. The affair has been popularly regarded as a Northwestern Salem.[2]
 
 
 60
 I concur in the majority opinion, insofar as it sets out the law to be applied to this case. I join in its express holdings, that (1) "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government";[3] (2) "there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way";[4] and (3) Devereaux must show, to avoid summary judgment as to deliberate fabrication, not just that an interviewer disbelieved an initial denial and continued with aggressive questioning, but that the interviewer knew or should have known that the alleged perpetrator was innocent or that the interview techniques were so abusive that the interviewer knew or should have known that they would yield false information.[5] These express holdings necessarily imply an additional holding: these rules of constitutional law apply not only to police, but also to the appellees in this case, who were social workers, and to others who act on behalf of the state. Anyone who acts on behalf of the government should know that a person has a constitutional right not to be "framed."
 
 
 61
 I respectfully dissent in part, but my dissent is limited to whether Devereaux's evidence established a genuine issue of material fact as to three of the four remaining appellants. Devereaux is, in my view, entitled to present his case to a jury as to Carrow, Wood and Alexander, because he has established a genuine issue of fact as to each of their claims for qualified immunity.[6] Devereaux has established a genuine issue of fact as to whether Carrow, Wood, and Alexander could have reasonably believed that their conduct did not violate Devereaux's constitutional rights.[7] I would therefore reverse the summary judgment against Devereaux as to those three appellees. I join fully in the majority opinion as to Abbey.
 
 
 62
 Reasonable jurors could conclude from Devereaux's evidence that Wood, Carrow and Alexander "continued their investigation of Devereaux despite the fact that they knew or should have known Devereaux was innocent" and"used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."[8]
 
 
 63
 The record and briefs are not as clear as we might like, for two reasons. First, the case was focused on Detective Perez through the initial panel decision but he settled while the appeal was pending, leaving only the four social workers as defendants. Second, much of the appellant's brief focuses on the incorrect argument that section 1983 liability could be based on the social workers' violations of state regulations as opposed to the United States Constitution or federal law. Nonetheless, Devereaux has both in the district court and here, provided sufficient argument and evidence to establish a genuine issue of fact as to the section 1983 claims. Our initial inquiry, under Katz, must be whether "the facts alleged show the officer's conduct violated a constitutional right," and the facts must be "taken in the light most favorable to the party asserting the injury."[9] The majority opinion acknowledges that the right at issue was clearly established, but asserts that Devereaux has not alleged facts sufficient to put any violation of the right at issue. I respectfully disagree with the majority's reading of the record, because it violates the requirement that the facts be "taken in the light most favorable to the party asserting the injury."[10]
 
 1. Linda Wood
 
 64
 Reasonable jurors could conclude that Wood "used investigative techniques that were so coercive and abusive that [she] knew or should have known that those techniques would yield false information"[11] and did so in circumstances where a reasonable person would have desisted if concerned about convicting an innocent individual. The new detective on the child sex abuse beat, Perez, had brought in A.S. for questioning. Devereaux himself had previously advised the social workers that this twelve year old girl had acted inappropriately on various occasions, including displaying sexual aggressiveness.
 
 
 65
 The evidence submitted, taken in a light most favorable to Devereaux, established that Wood knew or should have known that she was likely to be eliciting false accusations of sexual misconduct from A.S. In deposition testimony, A.S.'s mental health counselor acknowledged that A.S. "threatened to make a report of sexual abuse against [him ] specifically because she, at least in her perception, wasn't having one of her needs met," and that she made "numerous " threats of this kind.[12] A.S. later said in an interview that another of the Child Protective Services social workers "would attend the group sex sessions nearly every time," where "each of the adults would have intercourse with each of the children."[13] A.S. acknowledged in her statement that she "made false rape accusations against Mr. John B. who "worked at Albertson's and had caught her eating a doughnut without paying for it."[14] A reasonable interviewer would have to be very wary indeed of accusations of sexual misconduct by this dangerous girl.
 
 
 66
 In her interview with Wood and Perez, A.S. initially denied that Devereaux had done anything sexual to her. Perez then left A.S. alone with Wood.[15] A.S. eventually changed her story during this long interview.[16] Devereaux submitted evidence from which a jury could find that A.S. denied any sexual conduct from 5:00 P.M. to 10:00 P.M.[17] But after six hours of interrogation, A.S. changed her story, a change which A.S. said was "so she could get out of the office"[18] because she "got sick and tired of sitting there."[19] After that, her stories got increasingly lurid, expanding to nightly orgies with Devereaux and numerous other men, women and children.[20]
 
 
 67
 On summary judgment, the respondent is entitled to have the evidence evaluated and reasonable inferences drawn in his favor.[21] Although a jury could find in Wood's favor, it could also, on this evidence, find against her. A jury could infer that Wood and Perez held this child against her will until after six hours of confinement, fairly late at night, she told the story they wanted. The jury could infer that Wood knew the story was false because it took so long to extract, because A.S. had a history of threatening and making false sexual accusations, and because the means of extracting it were reasonably calculated to produce a false accusation. Holding a child captive and alone in a police station, and drenching her with sex talk until a late hour likely to be past her bedtime, until she says what the interrogators want, has a strongly coercive element. If someone were to force a twelve year old girl to watch pornographic movies for six hours and told her she could stop watching only if she accused a man she knew of a crime, that might be the kind of coercive pressure that could make a girl lie in order to escape. Making a twelve year old girl talk about sex in the police station for many hours could be comparable (or worse, because of its personal aspect). A jury could infer that, combined with A.S.'s known tendency to make false sexual accusations, this was a technique that Wood knew was likely to produce a false accusation.
 
 
 68
 The majority finds fault with my analysis on two grounds, that A.S. might only have threatened to make false accusations and not actually have done so, and that Wood, the social worker obtaining and using A.S.'s accusations, might not have known about A.S.'s proclivity for these kinds of lies. I see little significance to the majority's contention that A.S. had threatened to make false charges, and not actually done so. By her own admissions, A.S. did in fact make false sex accusations and not just threaten them. As for whether Wood knew that A.S. was inclined to make false sex charges, the record allows for a jury inference either way. Devereaux is entitled to have the evidence taken in the light most favorable to him, and that is decisive.[22] Devereaux's own prior reports of inappropriate sexual aggressiveness by A.S. were made to Wood's office, which would suggest an inference that the girl had sexual problems and that Devereaux was not trying to keep the girl's sexual activity secret. A counselor in Wood's office knew of A.S.'s numerous threats to make false sex accusations to get things she wanted. A.S. had made an allegation against someone in Wood's own office.[23] A jury would be permitted to infer that she would know of A.S.'s history with other individuals in her own Child Protective Services office in the little town of Wenatchee. Wood has not denied that she knew of A.S.'s history.[24]
 
 
 69
 The majority opinion seems to suggest that if Wood does not get the benefit of qualified immunity, then it would be denied "any time an interviewer discounts an initial denial and continues with aggressive questioning that produces an accusation."[25] This ignores the length and time of the interview, the coercive technique, and the history of the person being interviewed. It is one thing to follow up on a denial with further questioning. Getting A.S. alone with a female interviewer after her initial denial to Perez and Wood together might have been entirely reasonable, had that been all there was. It is quite another to use a coercive method of questioning -five hours of isolation of a child while drenching her in sexual conversation -to obtain an accusation by a person known to threaten and make false sex accusations.
 
 2. Carrow
 
 70
 Carrow participated in about fifty interviews.[26] A jury could infer from the depositions of girls interviewed that Carrow's method was to harangue the girls as liars until they accused Devereaux of sexual misconduct. In D.E.'s first interview, D.E. said Devereaux "treated her fine."[27] But a jury could infer from the evidence that Carrow later prevented this exonerating remark from being disclosed to Devereaux's attorney and lied about it under oath.[28] A jury could infer from the remark, and from Carrow's subsequent dishonest nondisclosure, that she knew Devereaux was innocent and covered up exonerating evidence.
 
 
 71
 With another girl, A.R., Carrow and Perez interviewed her together.[29] A.R. had initially accused Devereaux of sexual abuse, but recanted the next day.[30] A.R. was quite an interview subject. The way the police became involved with Devereaux in the first place was when he called them to report that A.R. had attempted to poison another girl at his house, A.S., and also Devereaux himself, by putting iodine in their soft drinks.[31] Perez had initially interviewed A.R., but asked nothing about her attempt to poison A.S. and Devereaux; Perez's only interest was sex. Both Perez and Carrow knew that A.R. was a victim of fetal alcohol syndrome, a brain disorder of children impaired in utero by maternal alcohol consumption, some characteristics of which are "inappropriate social behavior, memory deficits . . . lack of judgment, lack of remorse for misbehavior, lying,. . . unusual aggressiveness, and wide variations in learning abilities at different times."[32] The police report about the interview states that A.R. "suffers from fetal alcohol syndrome and has difficulty in remembering some events."[33]
 
 
 72
 A jury could infer that Carrow had reason to know that A.R.'s accusation of Devereaux was false because she had recanted, was mentally impaired, and because the accusation had been forced out of her. When she recanted, Perez threatened her with prosecution for false reporting if she stuck to her recantation, yet she stuck to it[34] A jury could infer that Carrow knew she must be telling the truth, because so vulnerable a girl was resisting such great pressure to give the detective and social worker what they wanted. The girl said to Perez "you make all the children lie,"[35] from which the jury could infer that Carrow, who was there when A.R. said this, knew that Perez was making all the children lie. The majority suggests that the proper inference to be drawn from this statement is that Carrow merely "discounted a witness's statement and pressed on."[36] That is one inference that a jury could draw, but not the most obvious one, and not the only one they could draw. As for the majority's suggestion that"we do not even have any evidence that Carrow approved use of the technique"[37] of threatening the girls to force accusations out of them, of course we do -she was present and acting in concert with Perez and she was silent when he made the threats.[38] A.R. told another of the social workers and Perez that Carrow lied to her, by telling her that Devereaux had been"found" guilty and that a semen sample had been found,[39] from which a jury could infer that Carrow knew Devereaux was innocent and was intentionally misleading a non-victim to make her testify falsely that she was a victim.
 
 
 73
 The majority opinion correctly notes that A.R., despite all the pressure, continued to maintain that her original accusation had been false and that Devereaux did not engage in any sexual misconduct with her.[40] A jury might nonetheless regard this evidence as material, on the theory that it showed that Carrow had probably used similarly coercive techniques to extract accusations she knew were false from other girls. Carrow participated in many interviews of girls who made accusations and did not recant, so her modus operandi was material to whether she was knowingly coercing production of false testimony, even if that modus operandi did not work with A.R. The majority opinion says "all we know is that on one occasion Carrow was present when someone else used threats," discounting the possibility of a "modus operandi" inference.[41] But with another interviewee who consistently maintained that Devereaux had not sexually molested her or anyone else in the home, Carrow showed the same pattern, simply refusing to take no as an answer.[42] Moreover, juries are generally allowed to hear evidence of conduct, even conduct not directly at issue as this was, to support an inference of similar conduct on other occasions.[43]
 
 
 74
 Again, a jury could find in Carrow's favor. It could interpret the evidence to be that Carrow had a good faith belief that Devereaux was guilty, and that any girl who denied it was lying, and ought reasonably to be questioned again and again until she found the "courage" to "tell the truth." But a jury would not have to interpret the evidence that way. A jury could also find that Carrow had every reason to think Devereaux was innocent, yet refused to accept this, and used all the coercion she could muster -lies to the girls, repeated interrogations, dragging them to the police station, threats of prosecution if they recanted any accusatory statements -to make them lie, and that she succeeded with some of them.
 
 3. Alexander
 
 75
 Alexander together with Detective Perez repeatedly interviewed C.M.[44] C.M. told lurid stories of sexual ceremonies conducted by her pastor at church and sex orgies with numerous male and female adults and children. She also stated that she had participated over twenty times in sex orgies at Devereaux's house where he and other men, all wearing sunglasses so that they could not be identified, had sexual intercourse with her as well as other girls.[45] The bizarre nature of C.M.'s account is highlighted by her flat statement that a woman who had lived with her family was "a witch " and "I think she cast a spell on my brothers and sisters."[46]
 
 
 76
 After Alexander and Perez interviewed C.M. the first time, Alexander sent her to a physician for an examination. The examining physician reported that although she had had a tear in her hymen, indicating some penetration, it was healed, leaving a vaginal orifice with a diameter of six to seven millimeters (a little over a quarter of an inch).[47] This tear was consistent with sexual abuse, but not with frequent and repeated full penetration by numerous adult men. The physician sent the report to Alexander.[48] After receiving it, Alexander together with Perez conducted a second interview of C.M.[49] During this second interview, Alexander and Perez obtained reconfirmation of the story, which they now had to know was false, of the "over twenty times" when Devereaux and other men raped C.M.[50]
 
 
 77
 A jury might give Alexander the benefit of the doubt because C.M.'s interviews are somewhat vague and seem to veer off into fantasy, such as her witchcraft accusation. A jury might understand her to mean that the sexual abuse consisted of digital penetration, which would be consistent with the medical report, rather than repeated and frequent mass rape with full penile penetration, which would not. But a jury could also conclude that, despite having obtained medical verification establishing that C.M. had not been frequently and repeatedly penetrated genitally by numerous adult men, Alexander nevertheless took advantage of C.M.'s childish vulnerability to obtain what Alexander knew to be a false accusation that she had been.
 
 
 78
 C.M.'s statement in evidence says that Alexander told her that "everything I said was true" and that"my mom confessed to everything I said."[51] This bolstering of C.M. had to take place at the second interview, when Alexander had to know that the account was false, because Linda Miller's confession came after the first interview.[52] Linda Miller had confessed that she herself sexually abused her children, but that so did many other men and women in the town, in numerous mass orgies at the Pentecostal church and various other locations, lasting most of the night, in which numerous men frequently and repeatedly had full genital sexual intercourse with C.M. and many other girls. The Wenatchee witch hunt may all stem from official acceptance of Linda Miller's excuse for her own sex crimes, that "everybody does it." C.M. told substantially the same story. But a jury could reasonably conclude that Alexander knew when she obtained it the second time (after she had obtained the medical report) that C.M.'s story was false, and that her use of C.M.'s mother's confession to obtain it was likely to elicit a false accusation of Devereaux consistent with C.M.'s mother's confession.
 
 
 79
 The majority argues for an inference exonerating Alexander: there was nothing wrong with "truthfully informing a witness about another witness' corroboration", and "by taking C.M.'s side, so to speak, she could gain C.M.'s trust and persuade her to describe what sort of abuse had really taken place."[53] Alexander's lawyer could make that argument to a jury, but the evidence would lend itself readily to Devereaux's side of the case. The jury could think that once a girl makes medically impossible claims, and alleges witchcraft and spells, a reasonable interviewer ought to be wary indeed of believing any accusations the girl makes. While a jury could draw the excusing inference the majority suggests, it could also draw a damning one, that continued interrogation of this disturbed girl was not a reasonable means of finding out "what sort of abuse had really taken place."[54]
 
 Conclusion
 
 80
 Witch hunts seem to be something universally regretted in retrospect, yet abetted by the legal system while they proceed. During the 1980's and 1990's, many towns in America were convulsed by accusations of mass sexual abuse of children in day care and foster care settings such as Devereaux's.[55] The accusations have often been replete with physically unlikely or impossible events. The accusations here included a witch casting spells, the child victim of repeated group rape who nevertheless retained her hymen, sex orgies in church, and the ability of numerous middle aged men to stay awake all night, night after night, and perform sexually dozens of times each night. Other day care and foster care mass sex cases have involved witches who flew on broomsticks, sacrificed babies, and bizarre occurrences in tunnels, despite the absence of baby deaths and excavations demonstrating the absence of tunnels. Common sense gets trampled in the rush to affirm fashionable hysterias. The creaky rigidity of our mechanisms for importing common sense into legal disputes sometimes keeps them from working.
 
 
 81
 After C.M. had claimed that a woman was a "witch " who had "cast a spell on my brothers and sisters, " and a medical report had proved that C.M.'s sex story could not be true, most sensible people would think of the Salem witch trials, and say to themselves "here we go again." The Salem witch trials were part of a mania, mostly in Europe but also in Salem, that ruined the lives of thousands of innocents.[56] The witchcraft accusations then, as now, often involved children and sex, such as the common accusation of being made to "submit to many unholy and disgusting ceremonies, " being "forced . . . to kiss . . . the superior on . . . the breech,"[57] roasting babies over fires,[58] and"every species of unmentionable debauchery,"[59] including "sexual intercourse with Satan."[60] In Salem, those who confessed to witchcraft generally received some leniency, but those who staunchly and truthfully maintained their innocence were hanged, as being what is now called "in denial." The Salem witch trials, like the modern ones, were based not on lynch mob action, but on formal trials based on expert witnesses' testimony. The Salem witch hunt began when a physician unable to relieve the apparently hysterical symptoms of a local minister's daughter, told the father "that the girls `were under the evil hand.' "[61] Both in Europe and the American colonies, highly educated people led the mania, instead of restraining it.[62]
 
 
 82
 Our judicial system ought not to be helpless to protect and vindicate the victims of witch hunts. Fortunately the majority opinion today clarifies the law of qualified immunity so that it will not continue to embolden those who manufacture false evidence to abet witch hunts. Unfortunately, it does not apply the law correctly. The fault in the majority opinion application of the law is that it overlooks the requirement that the evidence must be "taken in the light most favorable to the party asserting the injury."[63] As to the three remaining defendants with respect to whom we disagree, a jury could, on the evidence in the record before us, draw inferences either way. Devereaux is entitled, therefore, to get his case to a jury.
 
 
 83
 The doctrine of qualified immunity is useful when it enables government officials to do their duty with vigor, unafraid of enmeshment in lawsuits about new, doubtful or unclear constitutional claims they had no reason to know about. The doctrine would be harmful rather than useful if it protected government officials who deprived people of such fundamental and well known constitutional rights as the right not to have government officials manufacture false evidence against them. The vulnerability of government officials to lawsuits if they intentionally deprive people of their plain constitutional rights is an important deterrent to official abuse of individual rights. This is true regardless of whether they work in the police department or some other department. Nor can officials be immunized because they act with good underlying motives, such as to protect children from sexual exploitation. "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."[64]
 
 
 
 Notes:
 
 
 [1]
 Albigensian Crusade, (visited May 31, 2001)http://crusades. Boisestate.edu/Albi/.
 
 
 [2]
 See Dorothy Rabinowitz, Reckoning in Wenatchee, The Wall Street Journal, September 21, 1999. "The 1994-95 child sex abuse witch-hunt in Wenatchee, Wash., resulted in a massive frame-up. " Paul Craig Roberts, Saved by Pursuit of the Truth, The Washington Times, April 6, 2000; see also, Mike Barber, Wenatchee Haunted By Investigations, Seattle PostIntelligencer, September 10, 1999. Whitman County Superior Court Judge Friel stated that "no rational trier of fact would believe these allegations." Rabinowitz, Reckoning in Wenatchee, The Wall Street Journal, September 21, 1999.
 
 
 [3]
 Maj. Op. at 12209. Judge Fernandez's separate concurrence raises the question whether creation of false evidence, by itself, violates any constitutional right, even if there is no criminal proceeding based on it. Concurrence at 12223. We need not answer that question in this case, because the evidence did lead to a criminal proceeding. Devereaux was arrested and put in jail, See Doc. 27 Ex. 1; Doc. 50 Ex. A, formally charged with rape of a child and other crimes, See Doc. 49 Ex. F, and subjected to bail conditions on his release for an extended period. See Doc. 27 Ex. 4.
 
 
 [4]
 Maj. Op. at 12210.
 
 
 [5]
 Maj. Op. at 12211.
 
 
 [6]
 See Pierce v. Multnomah County, Oregon, 76 F.3d 1032, 1038-39 (9th Cir. 1996) (holding that when foundational facts regarding a qualified immunity claim remain in dispute, these facts must be decided by the jury); Act Up!/Portland v. Bagley, 988 F.2d, 868, 873 (9th Cir. 1993) ("If a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial.").
 
 
 [7]
 See Saucier v. Katz, 121 S. Ct. 2151, 2158 (2001).
 
 
 [8]
 Maj. Op. at 12211.
 
 
 [9]
 Katz, 121 S.Ct. at 2156.
 
 
 [10]
 Id.
 
 
 [11]
 Maj. Op. at 12211.
 
 
 [12]
 Doc. 36 Ex. Z, p. 77.
 
 
 [13]
 Doc. 144 Ex. E p. 4.
 
 
 [14]
 Doc. 144 Ex. E. p. 8.
 
 
 [15]
 Doc. 36 Ex. E1 p. 8-9.
 
 
 [16]
 Doc. 36 Ex. E1 p. 8-9.
 
 
 [17]
 Doc. 144 Ex. E p. 6.
 
 
 [18]
 Doc. 144 Ex E p. 6.
 
 
 [19]
 Doc. 37 p. 2.
 
 
 [20]
 Doc. 144 Ex. E p. 3-5.
 
 
 [21]
 See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Orsini v. O/S Seabrooke O.N., 247 F.3d 953, 958 (9th Cir. 2001).
 
 
 [22]
 See Katz, 121 S.Ct. at 2156.
 
 
 [23]
 Doc. 144 Ex. E p. 4.
 
 
 [24]
 Doc. 33.
 
 
 [25]
 Maj. Op. at 12220.
 
 
 [26]
 Doc. 76 p. 5-6.
 
 
 [27]
 Doc. 36 Ex. N p. 1; Doc. 88 Ex. B Pippen Dep. p. 81.
 
 
 [28]
 Doc. 36 Lacey Aff. Pg. 7 l. 1-18; Doc. 36 Ex. U, Carrow Dep. p. 129-30.
 
 
 [29]
 Doc. 76 p. 8-9.
 
 
 [30]
 Doc. 36 Ex. W p. 5.
 
 
 [31]
 Doc. 149 Ex. 1 p. 2.
 
 
 [32]
 Barbara A. Morse, Information Processing: Identifying the Behavior Disorders of Fetal Alcohol Syndrome, in Fantastic Antone Succeeds: Experiences in Educating Children with Fetal Alcohol Syndrome 26-27 (1993, Judith S. Kleinfeld and Siobhan Wescott, editors).
 
 
 [33]
 Doc. 36 Ex. K p.3.
 
 
 [34]
 Doc. 36 Ex. K p. 6; Doc. 76 p. 51-52.
 
 
 [35]
 Doc. 36 Ex. K p. 4.
 
 
 [36]
 Maj. Op. at 12220.
 
 
 [37]
 Maj. Op. at 12221.
 
 
 [38]
 See 4 Wigmore on Evidence§§ 1071 (Chadbourn rev. 1972) (noting silence has traditionally been taken to support an inference of assent to a third party's statement).
 
 
 [39]
 Doc. 36 Ex. K p. 4.
 
 
 [40]
 Maj. Op. at 12216.
 
 
 [41]
 Maj. Op. at 12221.
 
 
 [42]
 Doc. 77 p. 1-2.
 
 
 [43]
 See Fed. R. Evid. 404(b).
 
 
 [44]
 Doc. 149 Ex. 3; Doc. 149 Ex. 7; Doc. 144 Ex. G.
 
 
 [45]
 Doc. 149 Ex. 3 p. 9.
 
 
 [46]
 Doc. 149 Ex. 7 p. 6.
 
 
 [47]
 Doc. 144 Ex. C p. 4.
 
 
 [48]
 Doc. 144 Ex. C p. 5.
 
 
 [49]
 Doc. 149 Ex. 7.
 
 
 [50]
 Doc. 149 Ex. 7 p. 8.
 
 
 [51]
 Doc. 36 Ex. N1 p.26.
 
 
 [52]
 Doc. 36 Ex. F.
 
 
 [53]
 Maj. Op. at 12221.
 
 
 [54]
 Maj. Op. at 12221.
 
 
 [55]
 See People of the Territory of Guam v. McGravey, 14 F.3d 1344, 1350 n.1 (Reinhardt, J. dissenting) ("Simply put, I am aware of no trial since those held in Salem in which a group of adults suggested occurrences similar to those alleged in the McMartin and Akiki cases."); Dorothy Rabinowitz, The Hate-Crimes Bandwagon, The Wall Street Journal, June 27, 2000 (listing past child abuse hysterias based on false allegations); see also Dorothy Rabinowitz, "Finality" for the Amiraults, The Wall Street Journal, June 30, 1999; A Darkness in Massachusetts, The Wall Street Journal, February 15, 1995; Dorothy Rabinowitz, Television, Parents and Children on Trial, The Wall Street Journal, May 6, 1991.
 
 
 [56]
 See Charles M. Mackay, Extraordinary Popular Delusions and the Madness of Crowds 462-564 (Harmony Books 1980) (1852); Katherine W. Richardson, The Salem Witchcraft Trials 4 (1983).
 
 
 [57]
 See Mackay, supra note 40, at 475.
 
 
 [58]
 See id. at 476.
 
 
 [59]
 See id.
 
 
 [60]
 See id. at 481
 
 
 [61]
 Leo Bonfanti, 2 The Witchcraft Hysteria of 1692 3 (1977).
 
 
 [62]
 See generally, Mackay supra note 40; Richardson supra note 40; Bonfanti, supra note 45.
 
 
 [63]
 Katz, 121 S.Ct. at 2156.
 
 
 [64]
 Olmstead v. United States, 277 U.S. 438, 479 (1928) (Brandeis, J. dissenting).