Leonard R. MILSTEIN, Plaintiff,

v.

Stephen L. COOLEY; Robert B. Foltz; County of Los Angeles, Defendants.

No. CV9901054DDPAIJX.

United States District Court, C.D. California, Western Division.

June 12, 2002.

**1117**

ment. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court grants the motion.

## PROCEDURAL BACKGROUND

On January 29, 1999, Leonard Milstein (the "plaintiff" or "Milstein") filed an action against Stephen L. Cooley ("Cooley") and Robert B. Foltz ("Foltz") (collectively the "defendants") alleging due process violations under 42 U.S.C. § 1983 and malicious prosecution.[1] The Court dismissed the plaintiff's second amended complaint ("SAC") on the basis of absolute prosecutorial immunity, and an appeal to the Ninth Circuit followed. On appeal, the Ninth Circuit found that because certain acts by the defendants were not done in their role as advocates, the defendants were not shielded by absolute immunity as to all claims. *Milstein v. Cooley*, 257 F.3d 1004, 1011–13 (9th Cir.2001).

The Ninth Circuit held that absolute prosecutorial immunity applied to the defendants' conduct in securing a grand jury indictment, securing an information, and securing an arrest warrant. *Id.* The Ninth Circuit affirmed this Court's order that the decisions related to prosecuting Milstein did not state any claim for relief because of prosecutorial immunity. However, the Ninth Circuit determined that the defendants were not entitled to absolute immunity with regard to the allegations of fabricating evidence, filing a false crime report, misconduct in investigating the purported crime, and making statements to the media. *Id.* Thus, the Ninth Circuit reversed and remanded to this Court those claims relating to the pre-prosecution investigation.

Stephen Yagman, Marion R. Yagman, Kathryn Sue Bloomfield, Joseph Reichmann, Jr., Yagman Yagman & Reichmann, Venice, CA, Richard H. Millard, Los Angeles, CA, Wiley Ramey, Van Nuys, CA, for Leonard R. Milstein.

Steven D. Blades, David J. Wilson, Manning, Marder, Kass, Ellrod & Ramirez, Los Angeles, CA, for Stephen L. Cooley, Robert B. Foltz.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PREGERSON, District Judge.

This matter comes before the Court on the defendants' motion for summary judg-

---

1. Los Angeles County is also a named defendant, however, the instant motion is brought by Cooley and Foltz.

On October 9, 2001, the defendants brought a motion to dismiss the remanded claims. The Court granted the defendants' motion to dismiss with respect to the defamation claim, but denied the motion as to all other claims.

## FACTUAL BACKGROUND

In July 1987, a double homicide occurred in the Antelope Valley. (Stmt. Uncontroverted Fact ("UF") 1.) Sgt. Gil Parra ("Parra") of the Los Angeles County Sheriff's Department was assigned to investigate the murders. (UF 2.) Brad Millward ("Millward") was subsequently identified as a suspect, arrested, and charged with two counts of first degree murder. (UF 3.) Millward retained Milstein to represent him. (*Id.*) Deputy District Attorney John Portillo ("Portillo") was assigned to prosecute Millward. (UF 2.)

The criminal trial began with jury selection on March 27, 1989. Parra served as the investigating officer and was present during trial. Portillo worked under Steve Cooley, Head Deputy District Attorney for the Antelope Valley Branch of the District Attorney's office. The prosecution's theory was that Millward shot and killed both victims with a nine millimeter handgun. Prosecution witnesses included Daniel and Kathy Lucero and James and Teri Long. The defense theory was that Daniel Lucero actually committed the murders and used a .30 caliber and/or .223 caliber rifle. Milstein intended to call as witnesses, among others, Charlie Haas ("Haas"), Keith White ("White"), and Russell Myers ("Myers").

During Millward's criminal trial, Portillo and Parra learned that Haas, an inmate, had been recruited by Millward and Milstein to present false testimony at the Millward trial. (UF 4.)

On June 13, 1989, Haas told Portillo and Parra that he had met with Milstein and told Milstein the false story he was to testify to at trial. Milstein told Haas that he would need to change parts of the story. (UF 5.) Haas told Portillo and Parra that he changed his mind about falsely testifying at trial and conveyed this to Milstein, who said that the DA's witnesses were going to lie so there was no reason he (Haas) should not lie because it was all a big game.[2] (UF 6.) Haas told Portillo and Parra that inmate Keith White ("White") also was recruited by Millward to falsely testify at the Millward trial. (UF 7.)

On June 15, 1989, Portillo interviewed White who said that he agreed to falsely testify at the trial and that Millward had given White a statement telling him what his testimony should be. (UF 8.) White said that Milstein visited him in prison and gave him copies of preliminary hearing transcripts and photographs of prosecution witnesses. (UF 9.) A sheriff's detective confiscated the photographs, transcripts, and statement. (UF 10.)

On June 25, 1989, Portillo interviewed inmate Myers and learned that he also had been recruited by Millward to testify falsely at trial. (UF 11.) Myers told Portillo that Millward held a knife to his neck and forced him to write a statement about prosecution witnesses. (UF 12.) Myers told Portillo that he had told Milstein he did not want to testify at the trial, and Milstein said that he had signed a statement and would force Myers into saying what Milstein and Millward wanted him to say. (UF 13.)

Portillo and Parra believed that Millward and Milstein were involved in subornation of perjury in the Millward trial and

---

**2.** The Court notes that Haas was murdered on December 22, 1989, shortly after being released from prison. His murder remains unsolved.

conveyed their concerns to Cooley. Cooley told his supervisor, Richard Hecht ("Hecht"), about the information conveyed by Portillo and Parra and received permission from Hecht to request a preliminary investigation into these allegations. (UF 15.)

On July 5, 1989, Cooley wrote a memorandum to Tom Alexander ("Alexander"), a senior investigator with the District Attorney's Bureau of Investigation, requesting a preliminary investigation into the matter. (UF 16.) On that same day, Alexander completed a document entitled "Request for Investigation" setting forth Cooley's request. (UF 17.) The Request for Investigation was not a police or crime report, but a request to have an investigator interview Parra and Portillo. (UF 18; see also Alexander Decl. ¶ 5; Cooley Decl. ¶ 6.) Alexander wrote Cooley's name as the "complainant" on the Request for Investigation, indicating that Cooley was not reporting a crime but rather requesting an investigation. (UF 19; see also Alexander Decl. ¶ 5.) Cooley never signed a police or crime report indicating that he was reporting criminal conduct by Milstein. (UF 20; see also Cooley Decl. ¶ 7; Alexander Decl. ¶ 6.)

On July 5, 1989, Fred Bickle ("Bickle"), Alexander's supervisor, approved the request and assigned the case to Alexander for investigation. (UF 21.) Alexander interviewed Portillo and Parra on July 12 and 13, 1989, who told Alexander about their interviews with Haas, White, and Myers. (UF 22.)

On July 7, 1989, two days after Cooley requested the investigation into Milstein's actions, Albert Gutierrez ("Gutierrez") was called by Milstein as a defense witness. Gutierrez testified that he owned an auto repair shop and that, after the murders occurred, he worked on Lucero's car. Gutierrez testified that he saw ammunition in Lucero's trunk that supported the defense theory. Gutierrez produced a work order showing that he worked on Lucero's car on September 7, 1987. Portillo asked Gutierrez about other work orders during the same period. Gutierrez said that he had them in storage and would produce them in court.

On July 10, 1989, Gutierrez returned to court and gave Milstein the other work orders. Milstein then elicited testimony from Gutierrez that these work orders were written around the time Lucero's car was being repaired. Portillo was later able to conclusively demonstrate, through the owner of the company that printed the work order forms, that the forms presented by Gutierrez were first printed three months after the date written on the work order purporting to show the work Gutierrez had done on Lucero's car. (Alexander Decl. ¶ 8.)

On August 10, 1989, Portillo told Alexander about Gutierrez's testimony and first identified Gutierrez as someone who may have committed perjury in the *Millward* trial. (UF 24.)

On October 11, 1989, the *Millward* jury returned a not guilty verdict on one count of murder and was hung on the second count. (UF 26.)

On November 22, 1989, Cooley wrote a memorandum to his supervisor seeking direction as to which would be the appropriate agency to continue the investigation and was told that Alexander should continue the investigation. (UF 27.)

On February 6, 1990, Cooley and Alexander interviewed Gutierrez in state prison. (UF 28.) Cooley attended the meeting to evaluate Gutierrez as a witness and make any decisions regarding a possible recommendation of immunity. (UF 29.) After a brief introduction, the conversation was tape recorded and Gutierrez told Coo-

ley and Alexander that Milstein asked him to lie at the *Millward* trial. (UF 30.)

In June 1990, Cooley assigned Deputy District Attorney Robert Foltz to evaluate the completed investigation and to determine whether a prosecution of Milstein was warranted.[3] (UF 32.) On July 19, 1990, Foltz and Alexander interviewed Gutierrez in state prison to evaluate him as a witness. (UF 33.) On November 30, 1990, Foltz wrote a memorandum to Cooley recommending that Milstein be prosecuted, and Cooley concurred with this recommendation. (UF 36.) Cooley and Foltz attended a meeting with their supervisors, including Ira Reiner's Chief Deputy Greg Thompson, and were given permission to seek a Grand Jury indictment against Milstein. (UF 37.)

On May 23, 1991, the Los Angeles County Grand Jury returned an indictment against Milstein, charging him with eight counts of subornation of perjury and perjury-related offenses. On June 5, 1991, Milstein was arrested in San Luis Obispo and transported to Los Angeles County for booking.

In December 1994, a judge dismissed the Grand Jury indictment on the grounds that Foltz did not present exculpatory evidence about Milstein. (Foltz Decl. ¶ 7.) The exculpatory evidence included the fact that Milstein had been an attorney for quite some time and had never been disciplined, nor did he have a prior criminal record. (*Id.*)

On December 19, 1994, after the Grand Jury indictment was dismissed, a decision was made to file a felony complaint against Milstein. (*Id.*) The decision to prosecute Milstein by way of filing a felony complaint was approved by Sandra Buttitta, Gil Garcetti's Chief Deputy. (UF 38.)

On February 9, 1995, Judge Jeffrey Wiatt presided over a preliminary hearing. After hearing the evidence, Judge Wiatt held that there was probable cause to believe that Milstein committed the criminal acts and held Milstein to answer for trial on one count of conspiracy to obstruct justice, one count of subornation or perjury, two counts of perjury, one count of offering false documents, one count of solicitation to commit perjury, and one count of bribery of a witness.

Albert Gutierrez, Keith White and Lawrence Puckett testified in Milstein's criminal trial that Millward recruited them to present false testimony during Millward's murder trial. Gutierrez and White testified that after Millward recruited them, Milstein participated with them in preparing their false testimony.

Milstein was convicted of six of the eight counts charged. On appeal, the California Court of Appeal ruled that the evidence other than the testimony of Milstein's accomplices was legally insufficient to support the guilty verdicts.

Before the Court is the defendants' motion for summary judgment regarding the pre-prosecution allegations of fabricating evidence, filing a false crime report, and misconduct in investigating the purported crime. The defendants argue that they are entitled to qualified immunity as a matter of law.

## DISCUSSION

### A. *Legal Standard*

Summary judgment is appropriate where "there are no genuine issues as to any material fact and ... the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A genu-

---

**3.** Millward had pleaded guilty to manslaughter and, as part of his plea agreement, was not prosecuted for perjury related crimes during his criminal trial.

ine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. *Id.* at 252, 106 S.Ct. 2505. In determining a motion for summary judgment, all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Id.* at 242, 106 S.Ct. 2505.

## B. *Analysis*

The plaintiff claims that the defendants deliberately fabricated evidence during the pre-prosecution investigation of Milstein by causing Gutierrez, a key witness against Milstein, to lie. The defendants allegedly used this fabricated evidence to file a false police report and to investigate Milstein based upon this fabricated evidence. The plaintiff claims a constitutional injury arising from the criminal investigation because the defendants allegedly were seeking "retribution against plaintiff for having successfully represented his client Millward." (Second Amended Complaint ("SAC") ¶ 11.)

This Court relied on the Ninth Circuit case of *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir.2001) when deciding the defendants' motion to dismiss (the "Motion to Dismiss Order"). Because *Devereaux* also deals with a grant of summary judgment within the context of a § 1983 claim and the defense of qualified immunity, the Court relies on *Devereaux* for a framework within which to analyze the instant motion for summary judgment.

### 1. *Qualified Immunity*

Section 1983 creates a private right of action against individuals who, acting un-

der color of state law, violate federal constitutional or statutory rights. 42 U.S.C. § 1983. Qualified immunity, however, shields § 1983 defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court clarified the two-step qualified immunity inquiry. To decide whether a defendant is protected by qualified immunity, a court must first determine whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201, 121 S.Ct. 2151. If the plaintiff's factual allegations do add up to a violation of the plaintiff's federal rights, then the court must proceed to determine whether the right was "clearly established," i.e., whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. *Id.* In essence, at the first step, the inquiry is whether the facts alleged constitute a violation of the plaintiff's rights. If they do, then, at the second step, the question is whether the defendant could nonetheless have reasonably, but erroneously, believed that his or her conduct did not violate the plaintiff's rights. *Id.* at 205, 121 S.Ct. 2151 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.").

### 2. *Qualified Immunity As Applied To The Defendants*

In holding that there is a clearly established constitutional due process right not

to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government, the *Devereaux* court stated:

> Perhaps because the proposition is virtually self-evident, we are not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right. Rather, what is required is that government officials have "fair and clear warning" that their conduct is unlawful. *See United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (noting that "general statements of the law are not inherently incapable of giving fair and clear warning," and that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful' " (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (alteration in original)); *see also Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir.2001) ("Precedent directly on point is not necessary to demonstrate that a right is clearly established. Rather, if the unlawfulness is apparent in light of preexisting law, then the standard is met. In addition, even if there is no closely analogous case law, a right can be clearly established on the basis of common sense." (emendations, internal quotation marks, and citations omitted)).

*Devereaux*, 263 F.3d at 1074–75.

The *Devereaux* court referred to *Pyle v. Kansas*, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942), where the Supreme Court found that the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction violates the Constitution. Recognizing that *Pyle* does not deal specifically with the bringing of criminal charges, as opposed to the securing of a conviction, the *Devereaux* court found that "the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and *Pyle* is sufficiently analogous, that the right to be free from such charges is a constitutional right." *Devereaux*, 263 F.3d at 1075.

■ The Court finds that the plaintiff has a clearly established due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the defendants. *See id.* at 1074–75. However, to withstand summary judgment, the plaintiff must adduce sufficient evidence in support of his § 1983 claim based on fabrication of evidence. *Id.* In order to support his claim that the defendants violated his due process rights by fabricating evidence, the plaintiff at a minimum must point to evidence that supports at least one of the following two propositions: (1) the defendants continued their investigation of the plaintiff despite the fact that they knew or should have known that he was innocent; or (2) the defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. *Id.* at 1076.

The defendants contend that the plaintiff cannot show that they knew or should have known during the pre-prosecution investigation that Milstein was innocent of conspiracy to obstruct justice, perjury, offering false evidence, preparing false evidence and influencing testimony. The defendants further contend that the plaintiff cannot show that the defendants used abusive or coercive investigative techniques during the pre-prosecution investigation. The defendants conclude that the plaintiff has not set forth evidence to support his claim that the defendants violated his constitutional rights. Accordingly, the defendants claim that they are entitled to quali-

fied immunity because the plaintiff cannot show that the defendants violated his constitutional rights.[4]

a. *Did the defendants continue their investigation of Milstein despite the fact that they knew or should have known that he was innocent*

■ The plaintiff does not allege that he is innocent. The plaintiff alleges that "he could not legally be convicted because a basic element of the crime could never be established[.]" (SAC ¶ 9.) Moreover, the information gathered during the investigation does not support the conclusion that the defendants continued their investigation of Milstein despite the fact that they knew or should have known that he was innocent.

The investigation commenced because Parra and Portillo reported to Cooley that three inmates had provided information that Milstein was involved in criminal conduct during the Millward trial. One witness in particular, the now deceased Haas, claimed that Milstein asked him to commit perjury.

The evidence provided by Gutierrez also supports the inference that the defendants lacked the requisite knowledge of Milstein's innocence. Gutierrez testified that he agreed to provide false testimony at the Millward trial in exchange for legal representation by Milstein at a reduced fee. (*See* Defs' Mtn.; Ex. C at 69–70.) In addition, Gutierrez reported that the plaintiff suggested that Gutierrez would not go to prison because the plaintiff knew Judge Majors. (See Defs' Mtn.; Ex. B at 61–63.) The plaintiff continued to represent Gutierrez in at least two criminal matters while simultaneously calling him as a witness in the *Millward* trial. As the defendants also point out, there is no explanation for Gutierrez devising a plan on his own to fabricate work orders that placed Lucero in his shop so that testimony about the bullets would fit the defense theory of the case. (Defs' Mtn. at 21.)

The record of the investigation shows that there was evidence that perjury and obstruction of justice may have occurred during the *Millward* trial. The plaintiff was indicted by a Grand Jury, and later held to answer after a preliminary hearing. In addition, the plaintiff's criminal defense attorney filed motions to dismiss the criminal action that were denied by the trial judge. (Defs' Mtn. at 21; Pl's Depo. at 229, Ex. A to Blades Decl.) The plaintiff was subsequently convicted by a jury.

The Court of Appeal reversed the plaintiff's conviction based, in part, on California Penal Code § 1111.[5] The fact that the plaintiff's conviction was reversed, however, does not prove innocence nor does it show that the defendants should have known that Milstein was innocent at the pre-prosecution stage of the case. The Court of Appeal opinion in Milstein's crim-

---

4. The defendants also contend that the legal framework established in the defendants' moving papers is unchallenged. (Defs' Reply at 4.) The Court notes that the plaintiff filed two oppositions. However, neither opposition addressed the arguments raised in the defendants' moving papers. Indeed, neither opposition has a single evidentiary citation. Furthermore, neither opposition addresses the two key cases for the instant motion: *Devereaux*, 263 F.3d 1070 and *Saucier,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272.

5. California Penal Code § 1111 provides:

A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

inal case does not hold that he was innocent of the charges, and there was no trial court finding of innocence following the reversal. The Court of Appeal did not reject the accuracy of the evidence against Milstein, it only rejected the legal sufficiency of the evidence. (Defs' Mtn. at 21; Blades Decl. Ex. C.)

Accordingly, the Court finds that the plaintiff has not presented evidence to support the proposition that the defendants continued their investigation of Milstein despite the fact that they knew or should have known that he was innocent.

b. *Did the defendants use investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information*

■ There is no evidence suggesting that the defendants or anyone acting on their behalf engaged in any abusive or coercive investigative techniques. The information from Portillo and Parra suggested that Milstein and/or Millward were possibly involved in perjury related crimes during the *Millward* trial. Cooley sought permission from his supervisor, Richard Hecht, to request a preliminary investigation. Cooley wrote a memorandum to Alexander and requested that an investigation be commenced and that only Parra and Portillo be interviewed. Alexander then completed an internal document entitled "Request for Investigation" and submitted it to his supervisor Fred Bickle. Bickle approved the request and assigned the investigation to Alexander.

Cooley's participation in the investigation was minimal, consisting of only two interviews. Cooley attended those interviews primarily to evaluate the witnesses and address immunity issues. One of the interviews was of Gutierrez on February 6, 1990, some seven months after Cooley first requested the preliminary investigation.

The declarations from Cooley and Alexander state that no coercive or abusive investigative techniques were used in the interview of Gutierrez. In particular, neither Alexander nor Cooley asked Gutierrez to recant his testimony given at the *Millward* trial. The plaintiff has not submitted any evidence to the contrary.

Foltz interviewed Gutierrez on July 19, 1990, after the investigation had been completed and more than one year after it began. The purpose of this interview was for Foltz to evaluate Gutierrez as a witness during the possible criminal prosecution of the plaintiff. Gutierrez essentially repeated to Foltz the statement given earlier to Cooley and Alexander. Foltz and Alexander make clear in their declarations that no coercive or abusive techniques were used in this interview with Gutierrez.

The plaintiff has not submitted evidence that anyone, particularly Cooley and Foltz, engaged in any coercive or abusive techniques during this investigation. The overwhelming majority of the investigation was conducted by Alexander. Alexander was not pressured by Cooley or Foltz, nor did they apply any undue influence during the course of the investigation. (Defs' Mtn. at 22; Alexander Decl. ¶¶ 6 & 14.)

Accordingly, the Court finds that the plaintiff has not pointed to evidence that supports the proposition that the defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

c. *Conclusion*

The Court finds that the plaintiff has not produced evidence showing that there is an issue of fact regarding whether the defendants continued to investigate Milstein when they knew or should have known that he was innocent, or because the defendants used coercive or abusive

investigation tactics that would yield false information about Milstein. The plaintiff, therefore, has not shown that he suffered any constitutional injury of the type described in *Devereaux* during the pre-prosecution investigation.[6]

In its Motion to Dismiss Order, the Court found that rather than violating separate constitutional rights, the alleged evidence fabrication, crime report filing, and investigation were part of a continuum of unconstitutional conduct by the defendants designed to subject the plaintiff to criminal charges on the basis of false evidence. Because the Court finds that the defendants did not violate Milstein's constitutional right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government, the defendants' subsequent conduct based on the alleged false evidence is likewise found not to violate Milstein's constitutional rights.

Based on the legal standards in *Devereaux* and *Saucier*, the Court finds that the defendants are entitled to qualified immunity on all of the plaintiff's claims.

### CONCLUSION

Based on the foregoing analysis, the Court grants the defendants' motion for summary judgment on the basis of qualified immunity.

IT IS SO ORDERED.

---

6. The plaintiff contends that there are issues of credibility that preclude summary judgment. However, the plaintiff's contentions come down to speculation. The lesson of *Devereaux* is that the plaintiff cannot support his fabrication of evidence claim by mere allegations and speculation. 263 F.3d at 1076. The plaintiff has the burden of producing some evidence that either the defendants deliberately fabricated evidence against him in violation of his due process rights by continuing their investigation despite the fact that they knew or should have known that he was innocent, or using investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. *Id.* The plaintiff has failed to adduce such evidence.